644 F.2d 397
 DEBRA P., a minor by Irene P., her mother and next friend et
al., Plaintiffs-Appellees, Cross-Appellants,
v.
Ralph D. TURLINGTON, individually and as Commissioner of
Education et al., Defendants-Appellants, Cross-Appellees.
 No. 79-3074.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 May 4, 1981.
 W. Crosby Few, Tampa, Fla., James D. Little, Gen. Counsel, Judith A. Brechner, Deputy General Counsel, State Board of Education, Tallahassee, Fla., for defendants-appellants cross-appellees.
 Irving Gornstein, Washington, D. C., amicus curiae, U. S. A.
 Stephen F. Hanlon, Robert J. Shapiro, Bay Area Legal Services, Inc., Tampa, Fla., Diana Pullin, Cambridge, Mass., Roger L. Rice, Richard Jefferson, Center for Law and Ed., Peter M. Siegel, Miami, Fla., for plaintiffs-appellees, cross-appellants.
 David Rubin, Stephen J. Pollak, Richard M. Sharp, Washington, D. C., amicus curiae.
 Appeal from the United States District Court for the Middle District of Florida.
 Before FAY and VANCE, Circuit Judges and ALLGOOD*, District Judge.
 FAY, Circuit Judge:
 
 
 1
 The State of Florida, concerned about the quality of its public educational system, enacted statutory provisions leading to the giving of a competency examination covering certain basic skills. Many students passed the examination but a significant number failed. The failing group included a disparate number of blacks. This class action, brought on their behalf, challenges the right of the state to impose the passing of the examination as a condition precedent to the receipt of a high school diploma. The overriding legal issue of this appeal is whether the State of Florida can constitutionally deprive public school students of their high school diplomas on the basis of an examination which may cover matters not taught through the curriculum. We hold that the State may not constitutionally so deprive its students unless it has submitted proof of the curricular validity of the test. Accordingly, we vacate the judgment of the district court and remand for further findings of fact.
 
 I.
 
 2
 In 1976, the Florida Legislature enacted the Educational Accountability Act of 1976. Laws of Florida 1976, Vol. 1, Ch. 76-223, pp. 489-508. The intent of the legislature was to provide a system of accountability for education in the state and to ensure that each student was afforded similar educational opportunity regardless of geographic location. Fla.Stat.Ann. § 229.55(2)(a) (West 1977). The legislature established three standards for graduation from Florida public schools. First, the students were required to complete a minimum number of credits for graduation. Second, they were required to master certain basic skills. Third, they were required to perform satisfactorily in functional literacy as determined by the State Board of Education.[1] Each school district was directed to develop procedures for remediation, and a statewide testing program was outlined. Fla.Stat.Ann. § 229.57 (West 1977 & Supp.1980). In 1978, the Act was amended to require passage of a functional literacy examination prior to receipt of a state high school diploma.
 
 
 3
 At the time of the trial of this lawsuit, the examination, the SSAT II, had been administered three times. The failure statistics showed a greater impact on black students than on white students. In the Fall, 1977 administration, 78% of the black students taking the exam failed one or more sections of the test as compared with 25% of the white students. Of the 4,480 black students taking the test for the second time in Fall, 1978, 74% failed one or both sections. Twenty-five percent of the whites retaking the test failed. On the mathematics section alone, 46% of the blacks retaking the test failed. The results of the third administration in Spring, 1978, which were released during trial, indicated that 60% of the blacks taking the mathematics exam for the third time failed as compared with 36% of the whites. In May, 1979, of the approximately 91,000 high school seniors in Florida public schools, 3,466, or 20.049% of the black students had not passed the test as compared with 1,342, or 1.9% of the white students.[2]
 
 
 4
 Plaintiffs-appellees, Florida high school students, filed this class action in the United States District Court for the Middle District of Florida, challenging the constitutionality of the Florida State Student Assessment Test, Part II (SSAT II) under the due process and equal protection clauses of the Fourteenth Amendment. They also challenged the test under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1976) and the Equal Educational Opportunities Act, 20 U.S.C. § 1703 (1976). Plaintiffs were certified in three classes:
 
 
 5
 Class A all present and future twelfth grade public school students in the State of Florida who have failed or hereafter fail the SSAT II
 
 
 6
 Class B all present and future twelfth grade black public school students in the State of Florida who have failed or who hereafter fail the SSAT II
 
 
 7
 Class C all present and future twelfth grade black public school students in Hillsborough County, Florida, who have failed or hereafter fail the SSAT II
 
 
 8
 Class A, B, and C claimed that appellants[3] designed and implemented a testing program which is racially biased and violates the Equal Protection Clause of the Fourteenth Amendment. These three classes also claimed that appellants violated the Fourteenth Amendment in instituting a program denying diplomas without sufficient notice or time to prepare for the exam.
 
 
 9
 Classes B and C, the black students, claimed that the SSAT II is a device for resegregating the Florida public schools in violation of the Fourteenth Amendment, 42 U.S.C. § 2000d, and 20 U.S.C. § 1703 because those failing the test are placed in remedial classes which tend to contain more blacks than whites. Plaintiffs sought declaratory and injunctive relief.
 
 
 10
 The District Court, Debra P. v. Turlington, 474 F.Supp. 244 (M.D.Fla.1979) found that Fla.Stat.Ann. § 232.246(1)(b)[4] as applied in the present context, violated the equal protection clause of the United States Constitution, Title VI of the Civil Rights Act of 1964, and the Equal Educational Opportunities Act as to plaintiffs in classes B and C. It held that section 232.246(1)(b) (West Supp.1981) violated the due process clause of the United States Constitution as to plaintiffs in classes A, B, and C. Defendants-appellants were enjoined from the use of the test as a requirement for receipt of diplomas until the 1982-1983 school year. The court found that the use of the examination for remediation violated neither the Constitution nor statutes.
 
 
 11
 On appeal, the appellants contend that the court erred in finding that the use of the test violates due process because there was adequate notice and no property right was involved. They contend that the graduation requirement is not a punishment, does not deprive students of a "liberty" interest and does not violate the equal protection clause. Appellants contend that the court erred in finding 20 U.S.C. § 1701 and 42 U.S.C. § 2000d to be applicable. In their cross-appeal, plaintiffs-appellees contend that the district court erred in limiting the period of the injunction to four years and in upholding the validity of the examination.
 
 
 12
 We find, based upon stipulated facts, that because the state had not made any effort to make certain whether the test covered material actually studied in the classrooms of the state and because the record is insufficient in proof on that issue, the case must be remanded for further findings. If the test covers material not taught the students, it is unfair and violates the Equal Protection and Due Process clauses of the United States Constitution.
 
 II.
 
 13
 At the outset, we wish to stress that neither the district court nor we are in a position to determine educational policy in the State of Florida. The state has determined that minimum standards must be met and that the quality of education must be improved. We have nothing but praise for these efforts.[5] The state's plenary powers over education come from the powers reserved to the states through the Tenth Amendment, and usually they are defined in the state constitution.[6] As long as it does so in a manner consistent with the mandates of the United States Constitution, a state may determine the length, manner, and content of any education it provides.
 
 
 14
 The United States courts have interfered with state educational directives only when necessary to protect freedoms and privileges guaranteed by the United States Constitution. In 1899, for example, in the case of Cumming v. Board of Education, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262, the Court upheld the decision of a local board to close a black school while keeping a white school open. Finding that the decision was based on economic reasons, the Court said:
 
 
 15
 (T)he education of the people in schools maintained by state taxation is a matter belonging to the respective States, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of the rights secured by the supreme law of the land.
 
 
 16
 175 U.S. at 545, 20 S.Ct. at 201, 44 L.Ed. at 266. While the outcome of the Cumming case might be questioned in this post Brown era, it must be remembered that it was not until just before the First World War that compulsory school attendance laws were in force in all states.[7] Public education was virtually unknown at the time of the adoption of the Constitution. In 1647 Colonial Massachusetts directed its towns to establish schools, and in 1749, Franklin proposed the Philadelphia academy. Until after the turn of the century, education was primarily private and usually sectarian. Lemon v. Kurtzman, 403 U.S. 602, 645-47, 91 S.Ct. 2105, 2127-28, 29 L.Ed.2d 745, 774-75 (1976). Once part of the government, however, education became a significant governmental responsibility. As the Court noted in Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954):
 
 
 17
 Today, education is perhaps the most important function of State and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society.
 
 
 18
 Stating that the provision of education ranks at the apex of the functions of a state, the Court in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1971) was required to balance the state's need for its citizens to be educated against the citizens' hallowed right to free exercise of religion. "There is no doubt," the Court said, "as to the power of a state, having a high responsibility for education of its citizens, to impose reasonable regulations for the control and duration of basic education." 406 U.S. at 213, 92 S.Ct. at 1532, 32 L.Ed.2d at 24.
 
 
 19
 Though the state has plenary power, it cannot exercise that power without reason and without regard to the United States Constitution. Although the Court has never labeled education as a "fundamental right" automatically triggering strict scrutiny of state actions, see San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1972), it is clear that if the state does provide an educational system, it must do so in a non-discriminatory fashion. "Among other things, the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which may be protected by the Due Process Clause..." Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725, 734 (1975).
 
 III.
 
 20
 It is in the light of the foregoing discussion of the relationship between the state and federal governments that we must analyze the plaintiffs' claims that SSAT II violates the equal protection and due process clauses of the Fourteenth Amendment. It is clear that in establishing a system of free public education and in making school attendance mandatory,[8] the state has created an expectation in the students. From the students' point of view, the expectation is that if a student attends school during those required years, and indeed more, and if he takes and passes the required courses, he will receive a diploma. This is a property interest as that term is used constitutionally. See Goss v. Lopez, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725, 737 (1975). Although the state of Florida constitutionally may not be obligated to establish and maintain a school system, it has done so, required attendance and created a mutual expectation that the student who is successful will graduate with a diploma. This expectation can be viewed as a state-created "understanding" that secures certain benefits and that supports claims of entitlement to those benefits. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). As the trial court noted, "graduation is the logical extension of successful attendance." 474 F.Supp. at 266; and as appellees note in brief, before SSAT II, a student completing the necessary number of credits would graduate with a diploma. (Brief of Appellees at 52).
 
 
 21
 Based upon this implied property right, we find that the trial court was correct in holding that the implementation schedule for the test violated due process of law. In its finding, the court quoted from the report of the state's own task force:
 
 
 22
 The problems created by the abrupt schedule for implementing the Functional Literacy Test were most severe for the members of Florida high school graduation class of 1979. At the eleventh hour and with virtually no warning, these students were told that the requirements for graduation had been changed. They were suddenly required to pass a test constructed under the pressure of time and covering content that was presumed to be elementary but that their schools may or may not have taught them recently, well, or perhaps at all.
 
 
 23
 In retrospect, the Task Force believes that the schedule for implementing statewide high school graduation standards was too severe. We feel that most of the problems that are identified in later sections of this report are the result of trying to do too much in too little time. Consequently, we believe that the problems can and will be solved over time. Task Force on Educational Assessment Programs, Competency Testing in Florida Report to the Florida Cabinet (Part 1) 4 (1979).
 
 
 24
 474 F.Supp. at 265.
 
 
 25
 The due process violation potentially goes deeper than deprivation of property rights without adequate notice. When it encroaches upon concepts of justice lying at the basis of our civil and political institutions, the state is obligated to avoid action which is arbitrary and capricious, does not achieve or even frustrates a legitimate state interest, or is fundamentally unfair. See St. Ann v. Palisi, 495 F.2d 423, 425 n.5 (5th Cir. 1974).[9] We believe that the state administered a test that was, at least on the record before us, fundamentally unfair in that it may have covered matters not taught in the schools of the state.
 
 
 26
 Testimony at trial by experts for both plaintiffs and defendants indicated that several types of studies were done before and after the administration of the test. The experts agreed that of the several types of validity studies,[10] a content validity study would be most important for a competency examination such as SSAT II. The trial court apparently found that the test had adequate content validity, 474 F.Supp. at 261, but we find that holding upon the record before us to be clearly erroneous. In the field of competency testing, an important component of content validity is curricular validity, defined by defendants' expert Dr. Foster, as "things that are currently taught." (Tr.2845)[11] This record is simply insufficient in proof that the test administered measures what was actually taught in the schools of Florida.
 
 
 27
 During the course of pre-trial litigation, defendant-appellants stipulated as follows:
 
 
 28
 No effort was made by the Florida Department of Education to ascertain whether or not all the minimum student performance standards were in fact being taught in Florida public schools. (Stipulation 114)
 
 
 29
 The Florida Department of Education did not conduct any formal studies which showed whether or not the skills measured on the test were in fact taught in the public schools in the State of Florida. (Stipulation 117)
 
 
 30
 On oral argument before this Court, counsel for the appellants stated that the stipulations meant only that the state did no formal studies of the correspondence between what was tested and what was taught. She assured this Court that the state could prove that the test covered things actually taught in the classrooms. That may be the case, but this record does not establish such proof.
 
 
 31
 Dr. Thomas H. Fisher, Administrator of the Student Assessment Section, Department of Education, testified that the DOE merely assumed that things were being taught. (Tr.2844) Dr. John E. Hills, professor of Educational Research at Florida State University, testified that the test reliably and validly assessed applications of basic communications and math skills to everyday situations (Tr.2945), but he agreed that everything on the test might not have been taught.[12] Appellants placed into evidence some math books and communications teaching materials, but at least one teacher, Mr. Crihfield, testified that he did not cover the whole book in class. (Tr.3055).
 
 
 32
 We acknowledge that in composing items for a test, the writer is dealing with applications of knowledge, and therefore the form of the test question would not necessarily be the same as the form of the information taught in class. We think, however, that fundamental fairness requires that the state be put to test on the issue of whether the students were tested on material they were or were not taught.
 
 
 33
 We note that in requiring the state to prove on remand that the material was covered in class, we are not substituting our judgment for that of the state legislature on a matter of state policy. See Ferguson v. Skrupa, 372 U.S. 726, 731, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93, 98 (1963); Memphis Light, Gas and Water Division v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30, 39 (1978). We do not question the right of the state to condition the receipt of a diploma upon the passing of a test so long as it is a fair test of that which was taught. Nor do we seek to dictate what subjects are to be taught or in what manner. We do not share appellants' fear that our decision would prevent new items from being added to the curriculum. Those decisions would properly be left with the school authorities. As the United States Supreme Court said in San Antonio School District v. Rodriguez, 411 U.S. 1, 43, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16, 49 (1972):
 
 
 34
 The ultimate wisdom as to these and related problems of education is not likely to be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions.
 
 
 35
 Just as a teacher in a particular class gives the final exam on what he or she has taught, so should the state give its final exam on what has been taught in its classrooms.
 
 
 36
 It follows that if the test is found to be invalid for the reason that it tests matters outside the curriculum, its continued use would violate the Equal Protection Clause. In analyzing the constitutionality of the examination under the Equal Protection Clause, the trial court stated, "(i)f the test by dividing students into two categories, passers and failers, did so without a rational relation to the purpose for which it was designed, then the Court would be compelled to find the test unconstitutional." 474 F.Supp. at 260. Analyzing the test from the viewpoint of its objectives, the court found that it does have adequate construct validity, that is, it does test functional literacy as defined by the Board.[13] We accept this finding and affirm that part of the trial court's opinion holding that having a functional literacy examination bears a rational relation to a valid state interest. That finding is, however, subject to a further finding on remand that the test is a fair test of that which was taught. If the test is not fair, it cannot be said to be rationally related to a state interest.
 
 
 37
 We affirm the trial court's finding that the test items were not biased and that the test does not violate due process or equal protection by the fact that it is given only in public schools. As the court pointed out, the state need not correct all the problems of education in one fell swoop and it has a stronger interest in those for which it pays the cost. See Ambach v. Norwick, 441 U.S. 68, 77, 99 S.Ct. 1589, 1595 n.8, 60 L.Ed.2d 49, 57 (1979). At present, the State of Florida exercises very limited control over private schools.[14]
 
 IV.
 
 38
 In considering appellees' equal protection claim, the trial court was required to consider the impact of the legislative action upon the community, the historical background, and the sequence of events leading up to the legislative action. Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-268, 97 S.Ct. 555, 563-65, 50 L.Ed.2d 450, 4d6566 (1977). The trial judge found that until 1967, Florida operated a dual school system intentionally segregating on the basis of race. The court found that the period from 1967 to 1971, segregation persisted and predominantly black schools remained inferior in physical facilities, course offerings, instructional materials, and equipment.[15] Appellant Turlington admitted that in part the failures of the black students taking the SSAT II could be attributed to the unequal education they received during the "dual schools" period. The record clearly indicates that appellants were aware of the possibility that more blacks than whites would fail the test.
 
 
 39
 Finding insufficient evidence to support a holding that there was present intent to discriminate as defined by the Court in Personnel Administrator v. Feeney, 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (that the law was enacted in spite of or because of the foreseen racial impact), the trial court held that the past purposeful discrimination affecting appellees in classes B and C is perpetuated by the test and diploma sanction. In attempting to justify the use of an examination having such a disproportionate impact upon one race, the appellants failed to demonstrate either that the disproportionate failure of blacks was not due to the present effects of past intentional segregation or, that as presently used, the diploma sanction was necessary to remedy those effects. See McNeal v. Tate County School District, 508 F.2d 1017 (5th Cir. 1975). The trial judge was, therefore, correct in holding that the immediate use of the diploma sanction would punish black students for deficiencies created by the dual school system.[16]
 
 
 40
 With respect to the question whether administration of the test violates Title VI, 42 U.S.C. § 2000d (1976),[17] counsel for the United States conceded on oral argument before this court that if the test was found to be a fair test of what was taught in the schools, its use as a graduation requirement would not violate Title VI.[18] We agree with this conclusion.
 
 
 41
 Because the test perpetuates past discrimination as to classes B and C, the diploma sanction violates the EEOA, 20 U.S.C. § 1703 (1976) which requires an educational agency to take affirmative steps to remove the "vestiges" of dual school systems.[19] We affirm the holding that there is neither constitutional nor statutory violation in using the results of SSAT II as a mechanism for remediation only. 474 F.Supp. at 268.
 
 CONCLUSION
 
 42
 We recognize that the interests of the State of Florida in both the remediation and diploma denial aspects of the basic competency program are substantial. The trial court noted an impressively increasing passing rate for which Florida teachers and students are to be commended. We hold, however, that the State may not deprive its high school seniors of the economic and educational benefits of a high school diploma until it has demonstrated that the SSAT II is a fair test of that which is taught in its classrooms and that the racially discriminatory impact is not due to the educational deprivation in the "dual school" years.
 
 
 43
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 
 
 
 *
 District Judge of the Northern District of Alabama sitting by designation
 
 
 [1]
 The requirements are set out in Fla.Stat.Ann. § 232.246 (West Supp.1980) to which we will frequently refer:
 
 
 [232]
 246 General requirements for high school graduation
 (1) Beginning with the 1978-1979 school year, each district school board shall establish standards for graduation from its schools which shall include as a minimum:
 (a) Mastery of the minimum performance standards in reading, writing, and mathematics for the 11th grade, established pursuant to ss. 229.565 and 229.57, determined in the manner prescribed after a public hearing and consideration by the state board;
 (b) Demonstrated ability to successfully apply basic skills to everyday life situations as measured by a functional literacy examination developed and administered in a manner prescribed after a public hearing and consideration by the state board; and
 (c) Completion of a minimum number of academic credits, and all other applicable requirements prescribed by the district school board pursuant to s. 232.245.
 (2) The standards required in subsection (1), and any subsequent modifications thereto, shall be printed in the Florida Administrative Code even though said standards are not defined as rules.
 (3) The state board shall, after a public hearing and consideration, make provision for appropriate modification of testing instruments and procedures for students with identified handicaps or disabilities in order to ensure that the results of the testing represent the student's achievement, rather than reflecting the student's impaired sensory, manual, speaking, or psychological process skills, except when such skills are the factors the test purports to measure.
 (4) A student who meets all requirements prescribed in subsection (1) shall be awarded a standard diploma in a form prescribed by the state board; provided that a school board may, in lieu of the standard diploma, award differentiated diplomas to those exceeding the prescribed minimums. A student who completes the minimum number of credits and other requirements prescribed by paragraph (1)(c), but who is unable to meet the standards of paragraph (1)(a) or paragraph (1)(b), shall be awarded a certificate of completion in a form prescribed by the state board. However, any student who is otherwise entitled to a certificate of completion may, in the alternative, elect to remain in the secondary school on either a full-time or a part-time basis for up to 1 additional year and receive special instruction designed to remedy his identified deficiencies. This special instruction shall be funded from the district's state compensatory education funds.
 (5) The public hearing and consideration required in paragraphs (a) and (b) of subsection (1) and in subsection (3) shall not be construed to amend or nullify the requirements of security relating to the contents of examinations or assessment instruments and related materials or data as prescribed in s. 232.248.
 
 
 [2]
 Debra P. v. Turlington, 474 F.Supp. 244, 248-249 (M.D.Fla.1979)
 
 
 [3]
 Named defendants-appellants are: Commissioner of Education Ralph D. Turlington; the Florida State Board of Education: Governor Bob Graham, Secretary of State George Firestone, Attorney General Jim Smith, Comptroller General Gerald A. Lewis, Treasurer William Gunter, Commissioner of Agriculture Doyle Conner; the Florida Department of Education (DOE); the School Board of Hillsborough County, Florida: Roland H. Lewis, Cecile W. Essrig, Carl Carpenter, Jr., Ben H. Hill, Jr., A. Leon Lowrey; and Superintendent of Schools of Hillsborough County, Raymond O. Shelton. Defendants were sued in their individual as well as official positions
 
 
 [4]
 See note 1 supra
 
 
 [5]
 As of March, 1978, 33 states had taken some type of action to mandate minimum competency standards, and movements were under way in three more. See C. Pipho, Minimum Competency Testing in 1978: A Look at State Standards, 59 Phi Delta Kappan 585 (1978); M. S. McClung, Competency Testing Programs: Legal and Educational Issues, 47 Fordham L.Rev. 651 (1959)
 
 
 [6]
 Florida's original grant of educational authority appeared in the Constitution of 1868, Art. VIII, § 2. The section stated that the "legislature shall provide a uniform system of common schools, and a university," and further provided that they would be free. Present authorization is found in the Florida Constitution of 1968, Art. IX, §§ 1-5
 
 
 [7]
 Brown v. Board of Education, 347 U.S. 483, 489-90 n.4, 74 S.Ct. 686, 691, n.4, 98 L.Ed. 873, 878 n.4 (1954)
 
 
 [8]
 Fla.Stat.Ann. § 232.01 (West Supp.1981) mandates that children between the ages of 6 and 16 attend school
 
 
 [9]
 In St. Ann, two students were indefinitely suspended because of their mother's behavior. The court considered this punishment without personal guilt to be a violation of a fundamental concept of liberty. Although the St. Ann case is factually dissimilar to the one we here consider, it is clear that in neither case can the state arbitrarily interfere. The case of Mahavongsanan v. Hall, 529 F.2d 448 (5th Cir. 1976) is distinguishable in that in that case the plaintiff sought to require the state to give her a college diploma despite her failure to take a comprehensive examination. The court found that there was no denial of procedural or substantive due process because plaintiff had refused the university's efforts to tailor a special program to her needs. The expectations of college and high school students would certainly be different
 
 
 [10]
 Basic types of validity as defined by the American Psychological Association, Standards for Educational and Psychological Tests (1974) are as follows:
 Criterion related validity measurements of how well the test items predict the future performance of the test takers and how well the test results correlate with other criteria which might provide the same type of information.
 content validity measurements of how well a test measures a representative sample of behaviors in the universe of situations the test is intended to represent.
 construct validity how well the test measures the construct (defined as the theoretical idea developed to explain and organize some aspects of existing knowledge) for which it was designed.
 For an excellent discussion of the APA Standards as they relate to competency testing, see M.S. McClung, Competency Testing Programs: Legal and Educational Issues, 47 Fordham L. Rev. 651, 683 (1979).
 
 
 [11]
 There is evidence in the record that care was taken in constructing a test which would match the objectives of the schools. The trial court's discussion of the development 474 F.Supp. at 257-259, indicates that the test was probably a good test of what the students should know but not necessarily of what they had an opportunity to learn
 
 
 [12]
 A portion of Dr. Hill's testimony appears below:
 Q You're saying then that an item which might include an element that had not been taught in school might cause some problems in this regard?
 A Well, an item which is not part of the objectives of what we're trying to teach in school. I don't think you can probably comfortably say that every single thing that a person might have to do on a practical application problem has to be specifically taught. I would feel uncomfortable with that, because I don't think schools can teach every single thing.
 But the objective may be. They can apply the problem, the techniques to a tin roof. Did we teach about tin roofs in school? Well, I don't know that we do.
 But you sort of assume that that's available to most people.
 Q We have no way of knowing though whether something that is included in an objective is in fact included in all of the classrooms in the State of Florida. We have already had that testimony from Dr. Fisher. So it would be possible that a test item might impact more severely on a particular minority group because those children simply did not have as part of their educational experience attention to that particular matter?
 A Well, if they have not been taught the basics that it seems are part of the schools' essential material, then I'd say you're right. You know, there's let's turn now to construct validity.
 
 
 [13]
 Functional literacy is defined as "the ability to apply basic skills in reading, writing, and arithmetic to problems and tasks of a practical nature as encountered in everyday life." Exhibit CT 26 at 23 (Task Force Report)
 
 
 [14]
 See Fla.Stat.Ann. §§ 232.021, 229.821 (West 1977)
 
 
 [15]
 In making this finding, the trial court relied on "vast amounts of evidence" and upon judicial notice as well as expert testimony. The plaintiffs had originally asked the court to take judicial notice that as a result of attending segregated schools prior to the implementation of unitary school systems, many of the members of Classes B and C received an education inferior to that received by white students during the period. Based upon Brown v. Board of Education, 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873, 881 (1954) and upon Mannings v. Board of Public Instruction of Hillsborough County, Florida, 427 F.2d 874 (5th Cir. 1970), the trial court took judicial notice that the education received by the blacks was unequal. Tr. 36; 474 F.Supp. at 251, n.13
 
 
 [16]
 The trial court took judicial notice that many of the students in classes B and C attended segregated schools prior to the implementation of the unitary school system. As stated by the trial court, the remedy was as follows:
 In light of the evidence relating to the necessary period of time to orient the students and teachers to the new functional literacy objectives, to insure instruction in the objectives, and to eliminate the taint on educational development which accompanied segregation, the Court is of the opinion that the state should be enjoined from requiring passage of the SSAT II as a requirement for graduation for a period of four (4) years.
 
 
 [474]
 F.Supp. at 269
 
 
 [17]
 Appellees argue that further studies of the "differential validity" of the test should be done to determine whether the SSAT II tests blacks as blacks. We decline to disturb the trial court's finding that the test was valid in this respect. See 474 F.Supp. at 261 n.23
 
 
 [18]
 42 U.S.C. § 2000d:
 § 2000d. Prohibition against exclusion from participation in, denial of benefits of, and discrimination under Federally assisted programs on ground of race, color, or national origin
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 [19]
 If, upon remand, the appellants demonstrate that the examination is a fair test of that which is taught, we assume that the subject of the "vestiges" of the dual school system will again be examined by the trial court. A clarification of the role and effect of the "vestiges" of past discrimination upon appellees in classes B and C would be necessary in order to fashion a remedy