Charles BESTER, et al.,
Plaintiffs-Appellants,

v.

TUSCALOOSA CITY BOARD OF EDUCATION, et al., Defendants-Appellees.

No. 82–7349.

United States Court of Appeals,
Eleventh Circuit.

Jan. 16, 1984.

John H. England, Jr., Tuscaloosa, Ala., for plaintiffs-appellants.

Sam Phelps, Michael S. Burroughs, Tuscaloosa, Ala., for defendants-appellees.

Before GODBOLD, Chief Judge, RONEY and SMITH *, Circuit Judges.

---

\* Honorable Edward S. Smith, U.S. Circuit Judge   for the Federal Circuit, sitting by designation.

GODBOLD, Chief Judge:

This class action involves the validity of the institution of minimum reading standards for promotion in the Tuscaloosa, Alabama city schools. The district court found that implementation of the policy did not violate due process because the students had no property right in an expectation of promotion. The court also determined that the policy did not violate the proscription in *McNeal v. Tate County School District*, 508 F.2d 1017 (5th Cir.1975), of ability grouping in schools that only recently became unitary.

Plaintiffs sought a preliminary injunction against implementation of the policy and a permanent injunction until they had adequate time to prepare to meet the minimum standards.

From 1970 to 1981 the Tuscaloosa system was the subject of federal court litigation to desegregate its schools. In July 1981 the district court entered a consent decree that allowed three elementary schools to remain all black. Prior to this decree there had been five all-black elementary schools.

There had been no system-wide promotion policy when the five all-black schools operated. Each school made its own promotion decisions based on its own standards. According to plaintiffs, the mixed but primarily white schools had "retained" (a euphemism for non-promotion) students who did not read at minimum levels, while the all-black schools had not held such students back.

On June 22, 1981 the school board adopted a program to improve the quality of the schools. One component of the program established minimum standards for promotion, including the minimum reading levels at issue here. A child's reading level was to be determined by his progress in his reading program. No separate test would be used. The new promotion policy received some publicity, although its extent is not clear.

Students were informed of their reading levels on their first report cards for the 1981–82 school year. However, students were graded at the level at which they could read, not the level of the grade to which they were assigned. Thus, a 5th grader reading at the 3rd grade level could still receive high marks for his performance at the 3rd grade level. The report card contained directions on how to convert the student's instructional level to a grade level.

On March 2, 1982 the superintendent mailed letters to parents of children who were reading below grade level. The letter informed parents of the new promotion policy and the possibility that their child might be retained because of his substandard reading level. The board formally adopted on March 15, 1982 the specific minimum levels required for promotion.

Under the new policy, of students in the system in grades 1–5, 23.6% of black children were retained while only 5.8% of white children were held back. Plaintiffs are parents of children who attended the five all-black schools prior to the consent decree and sue on their behalf. All these parents received notices that their children probably would be retained under the new policy.

It is not contended that the school board adopted the new policy from improper considerations, racial or otherwise. Nor do plaintiffs attack or seek to go behind the consent decree that left three all-black schools in operation. Moreover, plaintiffs acknowledge, as they must, that a program of retaining students who do not perform satisfactory work is an acceptable practice in usual circumstances. Seen in its basic terms, plaintiffs' position is that a school system that has been accepting unsatisfactory work as a basis for promotion may not shift to a promotion standard requiring satisfactory work if the shift, measured statistically, impacts more heavily on black students than on white students, since presumably the heavier impact on black students is a consequence of their having been previously in a segregated school system. Plaintiffs make another point concerning the time of implementation of the new standards, claiming insufficient notice to parents that their children were at risk of non-promotion in the current school year. Abstractly the notice point troubled the district court and troubles us. But it is un-

clear what it is that plaintiffs assert would or should have been done if earlier notice had been given. They do not contend that the remedial reading efforts of the school system were deficient.

Finally, plaintiffs are unable to suggest what remedy would be appropriate if this court should accept their theory. They suggest, somewhat imprecisely, that plaintiffs might be promoted but continue to be taught reading at a lower level, with the hope that at some time their reading skills could be brought up to their grade levels. How this might be done, and what the consequence might be to their learning in other areas where reading is a prerequisite to learning, is not clear.

I. There is no property right

█ *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), explains the source of property rights.

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709. Both the Supreme Court and the Fifth Circuit have emphasized that the entitlement must be mutually recognized.

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.; accord Winkler v. County of DeKalb,* 648 F.2d 411, 413 (5th Cir.1981) (Unit B).

In *Debra P. v. Turlington,* 644 F.2d 397, *rehearing en banc denied,* 654 F.2d 1079 (5th Cir.1981) (Unit B), the court found a property interest in the student's expectation of receiving a high school diploma. 644 F.2d at 403–04. Both sides agree that *Debra P.* should guide our analysis, although they draw contrary conclusions from the case. We conclude that *Debra P.* is distinguishable and hold that plaintiffs had no property right in the expectation that substandard scholastic achievement would continue to be accepted as a basis for promotion.

In *Debra P.* the student expected that if she attended school for the requisite number of years and passed the required number of courses, she would receive a high school diploma. She was not denied a diploma because she did not satisfactorily perform the academic work required of her in the classroom but because a new and external test was required as a prerequisite to a diploma and the test was unrelated to academic work required in the school. The *Debra P.* court, in finding a property right in a diploma, did not consider the issues of social promotions and social graduations.

The students here expected that if they did the academic work required in a satisfactory manner they would be promoted. School personnel presumably shared such an expectation. All know, however, that what previously had been accepted as satisfactory in the reading program was by objective standards not satisfactory. Indeed, plaintiffs acknowledge, as they must, that a program of retention for students who do not perform satisfactory work is both acceptable and desirable. Their objections really run to both the implementation of the program at a time when it will affect students who are products of segregated schools and the alleged lack of sufficient notice to parents that their children were at risk of nonpromotion, thereby denying parents the opportunity to attempt to correct their children's substandard performance. However, an expectation of the plaintiff students that the schools would continue to promote students performing in a substandard manner is not reasonable and cannot form the basis of a property right. Students have no legitimate expectation that the meaning of "satisfactory work" done in the classroom will remain constantly fixed at a level that in truth is academically unsatisfactory. The plaintiffs have no property right in an expectation that they will be promoted despite objectively substandard classroom work.

## II. *McNeal v. Tate County School District*

The Fifth Circuit has frequently considered the issue of ability grouping in the context of schools that have only recently become desegregated. *E.g., Castaneda v. Pickard,* 648 F.2d 989 (5th Cir. 1981) (Unit A); *McNeal.* These cases establish that ability grouping in such a context is forbidden only if it results in resegregation of classes or schools. *See Castaneda,* 648 F.2d at 994. As plaintiffs' counsel conceded at oral argument, there has been no resegregation—the three all-black schools exist by reason of the consent decree the validity of which is not questioned. Given the structure of the Tuscaloosa city schools, there is no violation of *McNeal.*

AFFIRMED.