Meghan RENE, by her parents and next Friends, Michael and Robin RENE, et al., Appellants–Plaintiffs,

v.

Dr. Suellen REED, in her official capacity As Indiana State Superintendent of Public Instruction, et. al., Appellees–Defendants.

No. 49A02–0007–CV–433.

Court of Appeals of Indiana.

June 20, 2001.

Kenneth J. Falk, Jacquelyn E. Bowie, E. Paige Freitag, Indiana Civil Liberties Union, Indianapolis, IN, Attorneys for Appellants.

Karen Freeman–Wilson, Attorney General of Indiana, Beth H. Henkel, Frances H. Barrow, Linda S. Leonard, Deputy Attorneys General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

MATTINGLY–MAY, Judge.

Meghan Rene and certain other students with disabilities ("the Students") who were or are required to pass the Indiana graduation qualifying examination ("the GQE")[1] brought a class action

---

1. The Test is also known as the Indiana State-  wide Testing for Education Progress test, or

against Dr. Suellen Reed as Indiana Superintendent of Public Instruction ("the State"). They sought declaratory and injunctive relief, alleging the State violated their due process rights by imposing the GQE as a condition of high school graduation because the State had not previously required disabled students to meet the standards the State had implemented to prepare students for the GQE. Therefore, the Students say, it did not necessarily expose them to some of the material tested on the GQE. The Students also assert the State violated the Individuals with Disabilities Education Act (IDEA) because they were denied certain test-taking adaptations and modifications required for them pursuant to the IDEA. The trial court entered judgment[2] for the State, and we affirm.[3]

## FACTS

We summarized the evolution of this case in *Rene ex rel. Rene v. Reed*, 726 N.E.2d 808, 812–15 (Ind.Ct.App.2000), (hereinafter *Reed I*) where we reversed the trial court's order denying certification to one of the classes and redefining the other:

On May 21, 1998, the Students filed their class action Complaint seeking injunctive and declaratory relief. The Complaint, filed by their parents on the Students' behalf, set forth claims under 42 U.S.C. § 1983 and the Individuals with Disabilities Education Act, 20

"ISTEP + ."

**2.** Following a hearing on the Students' motion for preliminary injunction, the trial court entered, *sua sponte*, findings of fact and conclusions of law. It also entered an order denying injunctive relief. The parties agreed that a final judgment should be entered on the existing record, and the court entered final judgment on the basis of the findings and conclusions stated in its order denying injunctive relief. While the trial court incorporated

U.S.C. § 1401 ("IDEA"). The Students, as defined by proposed Class A, claim that the Appellee/Defendant, Dr. Suellen Reed (Dr. Reed), in her official capacity as Indiana State Superintendent of Public Instruction, violated their due process rights under the United States Constitution and the Indiana Constitution by requiring them to take and pass the Graduation Qualifying Examination ("GQE") when they had previously been exempted from standardized testing and/or had not been taught the subject matter on the tests. The Students, as defined by proposed Class B, claim that Dr. Reed violated their rights under the IDEA by requiring them to take the GQE without the testing accommodations and adaptations required by the Students' case conferences and individualized education programs.

In Indiana, students participate in the Indiana Statewide Testing for Educational Progress (ISTEP) testing program in the third, sixth, eighth and tenth grades. Ind.Code § 20–10.1–16–8. This test measures achievement in mathematics and language arts. Ind. Code § 20–10.1–16–7. The GQE is a portion of the tenth grade ISTEP examination. Subject to two exceptions, all Indiana high school students who wish to receive a high school diploma must take and pass the GQE. Ind.Code § 20–10.1–16–13. This includes students with disabilities. *Id.*

into the final judgment its preliminary injunction findings, there was no separate request for findings on final judgment.

**3.** We heard oral argument at Columbus North High School on April 12, 2001. We gratefully acknowledge the hospitality of the School and the Bartholomew County Bar Association, and we commend counsel for their capable advocacy.

The Students are four Indiana high-school students, who were in the 10th grade at the time the Complaint was filed. The Students belong to first class of Indiana students, the class of 1999–2000, who are required to pass the GQE as a prerequisite to receiving a high school diploma.[4]

As a condition of the State receiving federal financial assistance, the IDEA requires that students with disabilities must receive a public education which is free and appropriate given their specific needs. 20 U.S.C. § 1400(d); 20 U.S.C. § 1412(a)(1). Indiana receives money under the IDEA and is therefore bound by the federal requirements. Ind.Code § 20–1–6–1. The federal requirement that a student receive a free and appropriate education is ensured by means of an individualized education program ("IEP") which is prepared at least annually in a case conference which is attended by the students with disabilities' regular education teachers, special education teachers, parents and others who have knowledge and special expertise. 20 U.S.C. § 1414(d); Ind.Code § 20–1–6–1(5). The IEP contains the outline of the student's education, including the services to be provided and modifications to the general education program, including modifications to any statewide assessments to be given to special education students. 20 U.S.C. § 1414(d).

Prior to the change in the state statute requiring that students pass the GQE, case conference could indicate that a student with disabilities was excused from taking the GQE or other standardized testing, while still on the diploma track. The case conference could also determine that the tests for these diploma bound students would be taken diagnostically, which meant that they were not given under normal testing conditions, and if the student failed, there would be no adverse consequences such as remediation or retention. Prior to the GQE, students with disabilities on the diploma track received a high school diploma if they satisfied the requirements of their IEPs and the general state curriculum requirements, regardless of whether they took the standardized tests. Furthermore, prior to the GQE, there was not a requirement that in order to graduate, a student master the skills that are now tested by the GQE examination. The Students allege that as a result, many students with disabilities who were on a diploma track were not taught the information now tested on the GQE. Indeed, the State has acknowledged that there was no requirement that, prior to the GQE, students with disabilities be taught the skills which are now tested on the graduation examination.

[Meghan Rene] attends Ben Davis High School in Indianapolis, Indiana, and has received special education since the first grade. Prior to the GQE requirement, Meghan had always been excused from standardized testing. Meghan's IEP provided that she was in the diploma program and if she completed all her course work and complied with her IEP, she would receive a diploma. Meghan's IEP further provided that she be excused from standardized testing and also indicated that all tests were to be read to her. Meghan was first informed that she had to take the GQE in the fall of 1997. Meghan first took the exam in the fall of 1997 and the exami-

---

4. The only remaining named plaintiff of the original four is Meghan Rene. One of the plaintiffs dropped out of school; one passed the GQE; and one has been granted a waiver to receive a diploma.

nation was not read to her. Also, Meghan's IEP provided that she be allowed to use a calculator during testing. This accommodation was also disallowed when she took the GQE. Meghan failed the exam, and as of February 1999, had yet to pass the GQE.

\* \* \*

None of the representative plaintiffs are in the Core 40 curriculum program which would exempt them from the GQE. Further, all of the Students allege that they were not given sufficient notice that they would be required to pass the GQE and were not given the opportunity to adjust their curriculum in order to take courses that would specifically prepare them for the GQE. Additionally, the Students assert that they would not qualify under the waiver provision of Ind.Code § 20–10.1–16–13(e) because they have not obtained the necessary proficiencies in the tested areas to allow their teachers to so certify.

(footnote two supplied; record citations omitted).

## STANDARD OF REVIEW

■ Because the trial court, pursuant to the agreement of the parties, entered final judgment on the basis of the findings and conclusions it entered *sua sponte* in its order denying injunctive relief, we will consider the findings to be made voluntarily and will treat the decision as a general judgment with respect to issues not covered by the findings. Under that standard, the specific findings control only with respect to the issues they cover, and the general judgment controls as to the issues upon which the court has not found. *Catellier v. Depco, Inc.*, 696 N.E.2d 75, 77 (Ind.Ct.App.1998). We may not reverse the trial court's findings unless they are

clearly erroneous. *Id.* The general judgment will be affirmed if it can be sustained upon any legal theory by the evidence introduced at trial. *Id.* In our review, we will consider only the evidence that is most favorable to the trial court's judgment and will not weigh the evidence or judge the credibility of witnesses. *Id.*

## DUE PROCESS

■ The trial court properly found, and the State does not explicitly disagree, that the Students have a property interest protected by due process in the award of a diploma if all graduation requirements are met. If the state chooses to provide a public education system, it "is constrained to recognize a student's legitimate entitlement to a public education as a property interest which may be protected by the Due Process Clause." *Debra P. v. Turlington,* 644 F.2d 397, 403 (5th Cir.1981), *quoting Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). In *Debra P.,* students challenged a standardized test required by the State of Florida as a condition for receipt of a high school diploma. The court there noted that the exam might have covered matters not taught through the curriculum and it held the state could not constitutionally deprive its public school students of a diploma on that basis. 644 F.2d at 404.

While the State implicitly concedes there are due process implications in the case before us, it does assert as a threshold matter that there was no due process violation because "[t]he Students wrongly claim they had a legitimate expectation to receive a regular high school diploma because their case conference committees checked a box on their IEPs indicating that they were on a 'diploma track'" (Br. of Defendant–Appellant at 24) (hereinafter

"State's Br.").[5]

The Students do not argue a property interest had arisen because someone "checked a box on their IEPs;" rather, they rely on *Debra P.*, where the Seventh Circuit found a property right arising from the establishment of a system of free public education and from mandatory attendance laws:

> From the students' point of view, the expectation is that if a student attends school during those required years, and indeed more, and if he takes and passes the required courses, he will receive a diploma. This is a property interest as that term is used constitutionally.... This expectation can be viewed as a state-created "understanding" that secures certain benefits and that supports claims of entitlement to those benefits.

644 F.2d at 404.

Although the trial court acknowledged that due process was implicated by the GQE requirement, it found the imposition of the GQE as a condition to the grant of a diploma did not violate the Students' due process rights because the three years' notice the Students were given of the GQE requirement was adequate and because the Students' remedy for the schools' alleged failure to teach the subjects required by the GQE was "continued education and

remediation and not the award of a high school diploma." (R. at 1382.)

### 1. The Nature of the Due Process Implications of the GQE Requirement

We recognized in *Reed I* that due process is violated when a "graduation exam is 'fundamentally unfair in that it may have covered matters not taught in the schools of the state,' " 726 N.E.2d at 822 n. 8, quoting *Debra P.*, 644 F.2d at 404. We further noted "due process protections require that handicapped students be given sufficient notice of a minimal competency exam in order for them to prepare adequately to satisfy the new requirement." *Id.*, citing *Brookhart v. Illinois State Bd. of Educ.*, 697 F.2d 179, 186–87 (7th Cir. 1983).

### 2. The Asserted Due Process Violations

The Students allege the implementation of the GQE denied them due process because 1) the Students were not exposed during their schooling to some of the material tested on the GQE, and 2) they had inadequate notice of the requirement and inadequate time to prepare for the GQE.[6] They further assert that additional remediation is not an adequate remedy for the due process violation. Rather, they contend that the State should be enjoined from enforcing the GQE requirement until

---

**5.** It is not apparent from the Students' brief that they are making any such "claim," wrongly or otherwise. The State supports this characterization of the Students' argument by noting that disabled students are to receive a diploma which is not differentiated from that received by non-disabled students, but only if the minimum credit requirements are met. *See* 511 IAC 7–13–3(d).

**6.** The State characterizes the Students' argument as "ask[ing] this Court to order the State to provide them with credentials certifying their competencies, despite their inability to pass an examination that tests them on

ninth-grade standards and despite their local school corporations' inability to certify that they have acquired these skills." (State's Br. at 13.)

In fact, the Students nowhere argue they have such an entitlement to a diploma or that the State should be "ordered" to award diplomas to students who cannot pass the GQE. Instead, they argue the GQE requirement was improperly imposed on them without adequate notice or preparation and without allowance for testing accommodations called for in their IEPs.

the GQE represents a fair test of what disabled students have been taught.

### A. Notice of the GQE Requirement

In *Brookhart*, handicapped students challenged a school district decision in the spring of 1978 to require that all students eligible to graduate in the spring of 1980 pass a "minimal competency test" ("M.C.T") as a condition of the receipt of a diploma. The district publicized the new requirement with announcements in the mass media, distribution of circulars in schools, and individual mailings to some parents. In *Brookhart*, as here, the students did not "contest the factual basis underlying the loss of a liberty interest; in fact, they admit that they did not pass the M.C.T. Rather, they demanded procedures that would provide sufficient notice of the M.C.T. to enable them to prepare adequately to satisfy the new requirement." 697 F.2d at 185.

The *Brookhart* court determined the notice was inadequate despite the absence of evidence any student was unaware of the requirement. *Id.* at 182. There was evidence before the district court that the disabled students' IEPs did not expose them to up to 90 per cent of the material tested on the M.C.T., and the students had only one to one-and-one-half years to prepare for the test:

> [t]he plaintiffs' programs of instruction were not developed to meet the goal of passing the M.C.T., but were instead geared to address individual educational needs. Since plaintiffs and their parents knew of the M.C.T. requirements only one to one and a half years prior to the students' anticipated graduation, the M.C.T. objectives could not have been specifically incorporated into the IEPs over a period of years. If they were incorporated at all, it could only have been during the most recent year and a

half. As the Superintendent found, "in an educational system that assumes special education students learn at a slower pace than regular division students," a year and a half to prepare for the M.C.T is insufficient. Thus the length of notice, rather than a deliberate decision not to instruct plaintiffs because of their incapacity to master the material, explains the overwhelming lack of exposure to M.C.T. goals and objectives.

*Id.* at 187.

The *Brookhart* court declined to define "adequate notice" in terms of a specific number of years, but it noted the requirement would be satisfied if the school district 1) ensured that the students were sufficiently exposed to most of the material that appears on the test, or 2) produced evidence of "a reasonable and well-informed decision by the parents and teachers involved that a particular high school student will be better off concentrating on educational objectives other than preparation for the M.C.T." *Id.* at 187–88.

■ There was evidence in the case before us to support the trial court's determination that the students had adequate notice of the GQE requirement. The State notes the school districts had at least five years' notice of the GQE requirement, and the Students and their parents had at least three. The State cites *Board of Educ. of Northport–East Northport Union Free Sch. Dist. v. Ambach*, 90 A.D.2d 227, 458 N.Y.S.2d 680, 688 (1982), *aff'd* 60 N.Y.2d 758, 469 N.Y.S.2d 669, 457 N.E.2d 775 (1983) as authority for its premise that three years' notice is sufficient. In a portion of its decision the *Ambach* court addressed "remedially," rather than "functionally" handicapped children. It held "the three-school-year notice ... was not of such a brief duration as to prevent school districts from programming the IEPs of [remedially handicapped children]

to enable them to pass the basic competency tests required for diploma graduation."

*Debra P.* and *Anderson v. Banks,* 520 F.Supp. 472 (S.D.Ga.1981) also support the proposition that three years is sufficient notice.[7] In *Anderson,* two years' notice of a requirement that graduating students would need to demonstrate performance at a ninth-grade level was adequate where, as here, the test could be retaken and remediation was provided. In *Debra P.,* one year of notice was found insufficient where the state had not submitted evidence that the test covered material required to be taught in the classroom. On remand, the injunction was lifted after the state provided such evidence. 564 F.Supp. 177 (M.D.Fla.1983), *aff'd* 730 F.2d 1405 (11th Cir.1984). We cannot say the trial court erred to the extent it determined the State provided adequate notice that the Students would be subject to the GQE requirement.

## B. *Exposure to the Curriculum*

■ The Students assert non-disabled students had ten years to prepare for the GQE requirement while the disabled students, who do not learn at a normal rate, had only three. They note that the ISTEP program, without the GQE requirement, was added in 1987, and the State Board of Education was at that time directed to begin adopting educational proficiencies and achievement standards for grades one through eight. However, disabled students whose IEPs did not include regular instruction in mathematics and language arts were exempted from the proficiency standards in that such decisions regarding disabled students were to be made not pursuant to ISTEP but rather pursuant to the disabled students' case conferences and IEPs.

In 1990, the ISTEP statute was amended to apply to high school students, and the disabled students were again exempted. As a result, they assert, the curriculum for non-disabled students has been adjusted and aligned to the material tested on the ISTEP since 1987. The GQE requirement was added by legislation in 1995, with the testing requirement imposed for the first time on the class of 2000. Disabled students are not exempted from the GQE, regardless of any contrary indications in the case conferences or IEPs.[8] The Students point to record evidence that it was not until 1997 that the State's Special Education Director notified school administrators the GQE requirement would apply to disabled students, and that parents of the disabled students did not find out about the requirement until just before the first test was given in 1997.

---

7. We note that both of those cases involved allegations by African–American students that past segregation had resulted in their higher failure rate on standardized tests. The students in those cases were not characterized as "disabled" in the sense that they were unable to learn at the same pace as other students. Therefore, the length of time found to constitute adequate notice in those decisions is not necessarily adequate to permit preparation by disabled students such as those in the case before us.

8. The GQE requirement may be waived for a disabled student when the case conference determines the child is eligible to graduate after the student's teacher makes a written recommendation, in which the principal concurs, to the case conference committee. The recommendation must be supported by documentation that the student has attained the GQE academic standards in each GQE subject area where the student did not pass the GQE. The student must also retake the examination as required by his or her IEP, must complete remediation, must achieve a "C" average, must maintain 95% attendance, and must satisfy all other graduation requirements.

The trial court found the Students had been exposed to the curriculum tested on the GQE, and we cannot characterize that finding as clearly erroneous. In its findings of fact, the court noted that state law requires remedial assistance be provided to all students who do not meet the academic standards required to pass the GQE, and stated "Given the multiple remediation opportunities mandated by state law for students who take but do not pass the GQE, the Court finds it implausible that the Plaintiff class was not exposed throughout their high school career to the subjects tested on the GQE." (R. at 1375.)

The Students correctly note there was evidence presented that in order to learn the material tested on the GQE, students must have the appropriate base knowledge from earlier courses and from building blocks that were in place in elementary school. They note that disabled students, by definition, learn at a slower pace than other students. But, they assert, there was evidence that even after the imposition of the GQE requirement, the curriculum for a significant number of disabled students had not been "realigned to the proficiencies tested on the examination." (Br. of Appellants at 32) (hereinafter "Students' Br.").

While the State notes the school systems were required by statute and regulation to align their curriculum with the state standards, at least as of 1996, it does not directly argue the disabled students' curriculum addressed the GQE requirements in advance of the imposition of the GQE requirement on the Students. Rather, it asserts, the Students did not submit any evidence the GQE is not aligned with "the

curriculum required by state law to be offered at their schools and made available to them through state mandate, *given the multiple opportunities provided them to take the exam and the targeted remediation the State has made available at no cost to them.*" (State's Br. at 23) (emphasis supplied). Though the record suggests the Students would have benefited from earlier adjustment of their curriculum in order to prepare them for the GQE requirement, we cannot characterize as clearly erroneous the trial court's determination that the Students were exposed during their high school careers to the subjects tested on the GQE.

## C. Adequacy of Remediation Remedy

The trial court found that if the school systems had failed to teach the Students the subjects tested on the GQE despite the Students' ability to meet the GQE standards, "the remedy is not that the State be required to hand these Plaintiffs a diploma." (R. at 1381.) Rather, it concluded, citing *Brookhart*, that the remedy is to offer the students additional remediation and opportunities to acquire the necessary skills.

The *Brookhart* court did state that "in theory, the proper remedy for a violation of this kind is to require [the school district] to provide free, remedial special education classes to ensure exposure to the material tested...." 697 F.2d at 188.[9]

The Students note that the *Brookhart* case involved only 14 plaintiffs, and they point to *Anderson*, 520 F.Supp. at 512 as authority for their argument that where there is a "systematic failure of due process" (Students' Br. at 35) involving a

---

9. The *Brookhart* court determined it would, in the case before it, "be unrealistic to assume that eleven of these plaintiffs would be able to return to school without undue hardship," and accordingly held the school district could

not require the students to pass the standardized test as a prerequisite for a diploma. *Id.* The Students in the case before us direct us to no evidence of such undue hardship.

large number of students, the proper remedy is to enjoin the State from requiring the GQE until such time as it "is no longer irrational to impose the requirement on the class." (Students' Br. at 35.) They argue that until the GQE requirement has been in effect for the entire educational career of a student, the case conferences should be responsible for making the determination whether it is appropriate for a disabled student to take the GQE in order to graduate.

In *Anderson,* the court ordered the schools to award diplomas to all students who would have received them but for the graduation test policy. It went on to hold that "[n]o exit exam policy may be utilized until it is demonstrated that the test used is a fair test of what is taught." 520 F.Supp. at 512. Similarly, in *Debra P.,* the court held the state could not deprive its high school seniors of the benefits of a high school diploma until it demonstrated its version of the GQE was a fair test of what was taught in its classrooms. 644 F.2d at 408. There, the exam had had a disproportionate impact on black students due to unequal educational opportunities several years before the test was administered.

■ In light of the evidence before the trial court that the Students had between three and five years' notice they would be subject to the GQE requirement, we cannot say the trial court erred to the extent it determined the remediation offered by the State was an adequate remedy for any due process violation arising from the test requirement.

## INDIVIDUALS WITH DISABILITIES EDUCATION ACT [10]

The trial court made no findings of fact with regard to the students in Class B, who alleged a violation of the IDEA in the form of the State's failure to honor certain modifications and accommodations in the test-taking process. As its only conclusion of law on that issue, the trial court stated the Students had failed to "cite supporting law for their position that the State's policies violate IDEA," (R. at 1382), and therefore they had not established a *prima facie* case on that issue.

■ We note initially that the IDEA does not require specific results, but instead it mandates only that disabled students have access to specialized and individualized educational services. Therefore, denial of a diploma to handicapped children who cannot achieve the educational level necessary to pass a standardized graduation exam is not a denial of the "free appropriate public education" the IDEA requires. *Brookhart,* 697 F.2d at 183 (addressing the IDEA predecessor statute). Further, the imposition of such a standardized exam does not violate the IDEA where, as in the case before us, the exam is not the sole criterion for graduation. *Id.* "Congress' desire to provide specialized educational services . . . cannot be read as imposing any particular substantive educational standard upon the states." *Board of Educ. of Hendrick Hudson Central Sch. Dist. Westchester County v. Rowley,* 458 U.S. 176, 200, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).

The IDEA requires participating states to offer special education and related services in conformity with the individualized

10. 20 U.S.C. §§ 1401 *et seq.* Under Ind.Code § 20–1–6–4, the State "accepts all of the provisions and benefits of all laws enacted by the Congress of the United States which provide for aid to children with disabilities . . . and the Indiana state board of education shall comply with all the requirements of federal law concerning any such federal funds relating to such special educational activities . . . ."

education program (IEP) provided for in 20 U.S.C. 1414(d). The IEPs of the members of Class B state that the class members are on the diploma track but are to be excused from standardized testing or are to have certain accommodations during testing. While the definition of "free appropriate public education" mandated by the IDEA includes special education that meets the standards of the State educational agency, 20 U.S.C. § 1401(8)(B), *Rowley* notes that it "must also comport with the child's IEP." 458 U.S. at 203, 102 S.Ct. 3034; 20 U.S.C. § 1401(8)(D).

Because the State is requiring all the members of Class B to take and pass the GQE without certain adaptations or accommodations, the Students assert the IDEA is violated. "[S]tate procedures which more stringently protect the rights of the handicapped and their parents are consistent with the [IDEA's predecessor statute] and thus enforceable." *Antkowiak by Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir.1988). However, "those [procedures] that merely add additional steps not contemplated in the scheme of the Act are not enforceable." *Id.* The State, the Students say, accordingly cannot choose to honor some, but not other, of the modifications and adaptations called for in the IEP and cannot require a disabled student to take the GQE if he or she is properly exempted by the case conference.

■ We cannot say the trial court erred to the extent it determined the State need not honor certain accommodations called for in the Students' IEPs where those accommodations would affect the validity of the test results. The court had evidence before it that the State does permit a number of accommodations typically called for in IEPs. However, the State does not permit accommodations for "cognitive disabilities" that can "significantly affect the meaning and interpretation of the test score." (State's Br. at 44.)

For example, the State permits accommodations such as oral or sign language responses to test questions, questions in Braille, special lighting or furniture, enlarged answer sheets, and individual or small group testing. By contrast, it prohibits accommodations in the form of reading to the student test questions that are meant to measure reading comprehension, allowing unlimited time to complete test sections, allowing the student to respond to questions in a language other than English, and using language in the directions or in certain test questions that is reduced in complexity.

Neither the Students nor the State have directed us to decisions that directly address whether the IDEA is violated by prohibiting on a standardized graduation exam accommodations for "cognitive disabilities" that are provided for in a student's IEP. However, a number of administrative decisions have addressed one such accommodation—that of providing the services of a reader for a reading comprehension test. In those decisions, Office of Civil Rights hearing officers have found that states could properly require students to take a reading comprehension test without providing the services of a reader. For example, in *Mobile County Bd. of Educ.* 26 IDELR 695 (1997), the hearing officer decided the State could properly deny an accommodation in the form of a reader on the Alabama "exit exam." [11]

The IEP represents "an educational plan developed specifically for the child [that] sets out the child's present edu-

---

**11.** That decision was based in part on the fact the student had never before been provided that accommodation on any test, and there was no evidence the accommodation had ever been successful with that student.

cational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Board of Educ. of Oak Park & River Forest High School Dist. No. 200 v. Illinois State Bd. of Educ.,* 10 F.Supp.2d 971, 975–76 (N.D.Ill.1998). The GQE, by contrast, is an assessment of the outcome of that educational plan. We therefore decline to hold that an accommodation for cognitive disabilities provided for in a student's IEP must necessarily be observed during the GQE, or that the prohibition of such an accommodation during the GQE is necessarily inconsistent with the IEP. We cannot say the trial court erred when it determined the prohibition of certain accommodations did not violate the IDEA.

### CONCLUSION

While the Students have an interest protected by due process in fair implementation of the GQE requirement, we cannot say the trial court erred when it found the Students were exposed during their schooling to the subjects tested on the GQE, that they had adequate notice of that graduation requirement, and that the remediation and additional opportunities to take the GQE were an adequate remedy if due process was violated. The trial court further did not err to the extent it found the State's refusal to allow certain test-taking accommodations did not violate the IDEA. Accordingly, we affirm.

SHARPNACK, C.J., and BAILEY, J., concur.