**GI FORUM, IMAGE DE TEJAS, Rhonda Boozer, Melissa Marie Cruz, Michelle Marie Cruz, Leticia Ann Faz, Elizabeth Garza, Mark Garza, Alfred Lee Hicks, Brandye R. Johnson, Jocqulyn Russell, Plaintiffs,**

v.

**TEXAS EDUCATION AGENCY, Dr. Mike Moses, Members, and the Texas State Board of Education, in their official capacities, Defendants.**

No. Civ.A. SA–97–CA1278–EP.

United States District Court,
W.D. Texas,
San Antonio Division.

Jan. 7, 2000.

Albert H. Kauffman, San Antonio, TX, Cynthia M. Cano, Equal Employment Opportunity Commission, San Antonio, TX, Nina Perales, Mexican American Legal Defense, San Antonio, TX, for plaintiffs.

Geoffrey Amsel and Deborah Verbil, Office of Atty. General, Austin, TX, for Defendants.

## ORDER

PRADO, District Judge.

The issue before the Court is whether the use of the Texas Assessment of Academic Skills (TAAS) examination as a requirement for high school graduation unfairly discriminates against Texas minority students or violates their right to due process. The Plaintiffs challenge the use of the TAAS test under the Due Process Clause of the United States Constitution and 34 C.F.R. § 100.3, an implementing regulation to Title VI of the Civil Rights Act of 1964, asking this Court to issue an injunction preventing the Texas Education Agency (TEA) from using failure of the exit-level TAAS test as a basis for denying high school diplomas.[1] The Court has considered the testimony and evidence presented during five weeks of trial before the bench, as well as the relevant case law. After such consideration, and much reflection, the Court has determined that the use of the TAAS examination does not have an impermissible adverse impact on Texas's minority students and does not violate their right to the due process of law. The bases for the Court's determination are outlined more fully in its findings of facts and conclusions of law, below. The Court writes separately only to make a few general observations about the legal issues underpinning this case.

In deciding the issues presented, both at the summary judgment stage and at trial, the Court has been required to apply a body of law that has not always provided clear guidance. It is clear that the law requires courts to give deference to state legislative policy, *see Board of Educ. v. Mergens*, 496 U.S. 226, 251, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990); in the educational context, such deference is even more warranted, *see San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Education is the particular responsibility of state governments. *Id.* Moreover, courts do not have the expertise, or the mandate of the electorate, that would justify unwarranted intrusion in curricular decisions. *See id.* On the other hand, these considerations cannot be used to tie a court's hands when a state uses its considerable power impermissibly to disadvantage minority students.

---

**1.** This suit is also brought individually by nine Texas students who did not pass the TAAS exit-level examination prior to their scheduled graduation dates. Those students who actually testified request that their respective school districts issue their diplomas. Consistent with this Order, that request is denied. Those students who did not appear to testify—Melissa Marie Cruz, Michelle Marie Cruz, and Jocqulyn Russell—are dismissed from the case for failure to prosecute.

This case requires the application of law from a number of diverse areas—employment law, desegregation law, and testing law in areas such as bar examinations or teacher certification examinations. Only one case cited by any party or this Court is both controlling and directly on point—*Debra P. v. Turlington*, 644 F.2d 397 (5th Cir.1981). In *Debra P.*, the United States Court of Appeals for the Fifth Circuit found that a state could overstep its bounds in implementing standardized tests as graduation requirements. Specifically, the court found that a test that did not measure what students were actually learning could be fundamentally unfair. The court also found that a test that perpetuated the effects of prior discrimination was unconstitutional. This Court finds these ideas to be in step with the United States Supreme Court's suggestion in *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), that a state could violate the Constitution if it implemented policies that violated accepted educational norms.

In addition, this Court has allowed the Plaintiffs to bring a claim pursuant to a regulation adopted in conjunction with Title VI. *See* 34 C.F.R. § 100.3. That regulation, in clear, unmistakable terms, prohibits a federally funded program from implementing policies that have a disparate impact on minorities. *Id.* While the Court acknowledges that the United States Supreme Court has limited Title VI itself to constitutional parameters (i.e., has required a showing of an intent to discriminate in order to prove a violation), *see United States v. Fordice*, 505 U.S. 717, 722 n. 7, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992), the Court does not find that this limitation has been clearly and unambiguously extended to its implementing regulations. The Court is not alone in

reaching this conclusion. *See Cureton v. National Collegiate Athletic Assoc.*, 198 F.3d 107, 113 (3d Cir.1999); *Elston v. Talladega Co. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir.1993); *Harper v. Board of Regents of Ill. State Univ.*, 35 F.Supp.2d 1118, 1123 (C.D.Ill.1999); *Valeria G. v. Wilson*, 12 F.Supp.2d 1007, 1023 (N.D.Cal.1998); *Graham v. Tennessee Secondary Athletic Ass'n*, No. 1:05–CV–044, 1995 WL 115890, at *12 (E.D.Tenn. Feb.20, 1995). Nor is the Court alone in concluding that a private right of action exists under this regulation. *See, e.g., Harper*, 35 F.Supp.2d at 1123; *Valeria G.*, 12 F.Supp.2d at 1023; *Graham*, No. 1:05–CV–044, 1995 WL 115890, at *12. The Court believes that it has followed the law as it presently exists in allowing these claims to go forward.

In reviewing the diverse cases that underpin this decision, the Court has had to acknowledge what the Defendants have argued throughout trial—this case is, in some important ways, different from those cases relied upon by the Plaintiffs. In the first place, this case asks the Court to consider a standardized test that measures knowledge rather than one that predicts performance. The Court has had to consider whether guidelines established in the employment context are adequate for determining whether an adverse impact exists in this context. In addition, the Court has been required to determine the deference to be given to a State in deciding *how much* a student should be required to learn—the cut-score issue. Finally, the Court has had to weigh what appears to be a significant discrepancy in pass scores on the TAAS test with the overwhelming evidence that the discrepancy is rapidly improving and that the lot of Texas's minority students, at least as demonstrated by academic achievement, while far from perfect, is better than that of minority students in other parts of the country and appears to be getting better.[2]

2. The Court read and heard with interest the conclusions of Plaintiff's expert Amilcar Shabazz on this subject. *See Report of Dr. Amilcar Shabazz,* Plaintiff's expert, at 11–12.

Shabazz rejects the argument that offering focused remedial efforts to students who do not pass the TAAS helps eradicate the effects of past discrimination. A student who fails the

This case is also remarkable for what it does *not* present for the Court's consideration. In spite of the diverse and contentious opinions surrounding the use of the TAAS test, this Court has not been asked to—and indeed could not—rule on the wisdom of standardized examinations. This Court has no authority to tell the State of Texas what a well-educated high school graduate should demonstrably know at the end of twelve years of education. Nor may this Court determine the relative merits of teacher evaluation and "objective" testing.

This case is also not directly about the history of minority education in the State. While that history has had some bearing on some of the due process concerns raised by the Plaintiffs, what is really at issue here is whether the TAAS exit-level test is *fair.* As the Court notes below, the test cannot be fair if it is used to punish minorities who have been victimized by state-funded unequal educations. Thus, the Court has carefully considered the claims that Texas schools still offer widely diverse educational opportunities and that, too often, those opportunities depend on the color of a student's skin or the financial resources of the student's school district.[3] To some degree, as discussed below, the Court must accept these claims. But that finding, alone, is an insufficient basis for invalidating this examination. There must be some link between the TAAS test and these disparities. In other words, the Plaintiffs were required to prove, by a preponderance of the evidence, that the TAAS test was implemented in spite of the disparities or that the TAAS test has perpetuated the disparities, and that requiring passage of the test for graduation is therefore fundamentally unfair. The Court believes that this has not been proven. Instead, the evidence suggests that the State

of Texas was aware of probable disparities and that it designed the TAAS accountability system to reflect an insistence on standards and educational policies that are uniform from school to school. It is true that these standards reflect no more than what the State of Texas has determined are essential skills and knowledge. It is undeniable that there is more to be learned. However, the Court cannot pass on the State's determination of what, or how much, knowledge must be acquired prior to high school graduation.

This case presented widely differing views of how an educational system should work. One set of witnesses believed that the integrity of objective measurement was paramount; the other believed that this consideration should be tempered with more flexible notions of fairness and justice. Thus, the relative quality of experts in this case is not so simple a matter as either party would make it. On the issue of internal test fairness and soundness, clearly the TEA presented better experts—their experts wrote the test and have written other tests. Their experts are invested in the profession and practice of test-writing and are committed to standardized tests as useful exercises for various kinds of educational measurement. However, TEA's experts were not so qualified, the Court finds, to speak on the wisdom of the use of standardized tests as they apply to ethnic minorities in a state educational system that has had its difficulties providing an equal education to those minorities. In that regard, the expert testimony failed to match up. TEA's experts, for example, are not especially qualified to speak on the psychological, social, or economic effects of failing to pass a test used as a requirement for graduation. At least one of those experts testi-

test does not graduate. A student who has been remediated and finally passes the test has only passed a test, not necessarily received an adequate education. The Court notes in response that its authority to determine what constitutes an "adequate" education is extremely limited.

3. Of course, these are generalizations. The Court recognizes that students in districts with relatively greater resources have failed the TAAS examination.

fied that whether a given test item disadvantages minority students is a factor that an item reviewer may ultimately *reject* in determining whether an otherwise valid item should be placed on the test. This is so because, as TEA's experts overwhelmingly testified, what is fundamentally important to these psychometricians is that the test objectively measure the material that it purports to measure and that it measure content that students have been exposed to.[4] *See Report of Dr. Susan Phillips*, Defendants' expert, at 16 (a plausible explanation for differential performance is difference in achievement level). On the question, then, of whether it is *wise* to use standardized tests in making high-stakes decisions, taking into account all the contextual factors, the Court finds the expert testimony was not fairly joined. Plaintiff's experts had clearly considered this question more fully and given it more weight. The question is—how relevant to this Court's decision is the *wisdom* of the TAAS test and, to the extent that Plaintiff's experts were able to prove that the test is not *wise*, have they been able to show that it actually crosses the line and is impermissible by some legal standard?

Ultimately, resolution of this case turns not on the relative validity of the parties' views on education but on the State's right to pursue educational policies that it legitimately believes are in the best interests of Texas students. The Plaintiffs were able to show that the policies are debated and debatable among learned people. The Plaintiffs demonstrated that the policies have had an initial and substantial adverse impact on minority students. The Plaintiffs demonstrated that the policies are not perfect. However, the Plaintiffs failed to prove that the policies are unconstitutional,

that the adverse impact is avoidable or more significant than the concomitant *positive* impact, or that other approaches would meet the State's articulated legitimate goals. In the absence of such proof, the State must be allowed to design an educational system that it believes best meets the need of its citizens.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT[5]

#### THE TEST

#### Test Construction

In 1984, the Texas legislature passed the Equal Educational Opportunity Act (EEOA), designed to impose an "accountability" system on Texas public school administrators, teachers, and students. The following year, in response to that legislation, the Texas State Board of Education adopted a curriculum of Essential Elements.[6] In addition, the Board moved forward with its plans to implement an objective standardized test that would measure mastery of the state-mandated curriculum. In 1987, Texas instituted the TEAMS high school graduation exit test, given to eleventh-graders.

In 1990, Texas replaced the TEAMS test with the Texas Assessment of Academic Skills (TAAS) test, the subject of this lawsuit. Like the TEAMS test, the TAAS test is designed to measure mastery of the state-mandated curriculum. However, the TAAS test seeks to assess higher-order thinking and higher problem-solving skills than did the TEAMS test. The TAAS test is developed and constructed by

4. The Court does not suggest that the psychometricians who testified on behalf of the TEA reject the notion that a test's effects should be fair. Rather, they view the system in place, which provides wholly objective assessment, as the best way to ensure fairness. In addition, Defendants' expert Dr. Susan Phillips noted that careful scrutiny is given to test items that are identified as having large differences between the performances of minori-

ty and majority students. *See Report of Dr. Susan Phillips*, Defendants' expert, at 3.

5. Any finding of fact more appropriately characterized as a conclusion of law may be considered as such.

6. In 1998–1999, the Texas Essential Knowledge and Skills (TEKS) replaced the Essential Elements.

National Computer Systems (NCS), a private corporation. NCS, in turn, subcontracts development of TAAS items to Harcourt Brace Educational Measurement (HBEM) and Measurement Incorporated. HBEM contracts with individuals to write items for the TAAS test. In addition to the extensive input from these professional test-designers, many of whom are not in the State of Texas, there is a great deal of input from state educators in the design of the TAAS test. Decisions as to which portions of the state-mandated curriculum should be measured by the TAAS test are made by Texas teachers and educational professionals. The Texas Education Agency has ensured that the educators comprise an ethnically diverse group of individuals from across the state. In addition, proposed TAAS questions are reviewed by subject-matter content experts, review committees of teachers and educators, test-construction experts, and measurement experts.

In reviewing test items, educators are instructed to consider the following issues: relevancy of the item, difficulty range, clarity of the item, correctness of the keyed answer choice, and the plausibility of distractors. Reviewers are also asked to consider the more global issues of passage appropriateness, passage difficulty, and interactions between items within and between passages as well as work, graphs, or figures. Reviewers are asked to assess whether or not each item on the TAAS exam covers information that was sufficiently taught in the classroom by the time of the test administration. After this initial review, a second review is conducted by staff members of the Student Assessment and Curriculum divisions of the TEA and by developmental and scoring contractors.

Selected questions are then field tested. The results of those field tests are reviewed by a Data Review Committee. Committee members are permitted to remove items they consider to be questionable, including questions that a disproportionate number of minority students fail to answer correctly. Reviewing members are given "great deference" in this process and are not required to eliminate a question that reflects that any ethnic group had particular difficulty with the question. *See Report of Dr. Susan Phillips*, Defendants' expert, at 17. If the reviewer finds that an item with a predicted adverse effect on minorities is a "fair measure of its corresponding state objectives *for all students*, and is free of offensive language or concepts that may differentially disadvantage minority students," the item may be retained, even if a significantly larger number of minority students do not answer it correctly. *Id.* (emphasis in original).

### Test Validity

Several concepts are key to understanding the arguments raised by the parties regarding the validity of the TAAS examination. The "validity" of a given standardized test refers to the "weight of the accumulated evidence supporting the particular use of the test scores." *Report of Dr. Susan Phillips*, Defendants' expert, at 3. "Content validity" measures the degree to which the test measures the knowledge and skills sought to be measured, in this case the legislatively mandated minimum essentials. *Id.* "Curricular validity" refers to the issue of whether students have an adequate opportunity to learn the material covered on a given standardized test. *Id.* at 10. "Test reliability" is "an indicator of the consistency of measurement." *Id.* at 4. Reliability may be tested by repeat testing or by various measures based on a single-test measurement. *Id.*

Each form of a standardized test must be valid and reliable. Validity and reliability across different forms of the test are ensured by "equating" test forms, or adjusting for any minor variations in difficulty between the forms. *Id.* at 7. The TAAS test is "equated" under what is called the Rasch Model. *Id.* This model focuses narrowly on item-difficulty parameters and does not provide for "item weighing," as do more complex equating models. *Id.* In other words, part of equating test forms involves using a fairly simple formula, the

Rasch Model, to determine how well a student's response on a given question predicts that student's success on the exam as a whole. "Point biserials" measure the degree to which persons who answer an item correctly tend to also have high total test scores and vice versa. *Id.* at 21.

## Test Administration

Texas public school students begin taking the TAAS test in the third grade. In the tenth grade, Texas·public school students are given what is called the "exit-level" TAAS exam, or· the examination they must pass in order to graduate. Students must pass each of three portions of the TAAS test—a reading, mathematics, and writing portion—in order to graduate. Texas public school students who do not pass the test on their first attempt are then given at least seven additional opportunities to take and pass the TAAS exam before their scheduled graduation date.

## THE PASSING STANDARD

The initial passing standard, or cut score, on the TAAS test was set at 60 percent, and a 70–percent passing standard was phased in after the first year. In setting the passing standard, the State Board of Education looked at the passing standard for the TEAMS test, which was also 70 percent, and also considered input from educator committees. In addition, the selection of the score reflected a general sense that 70 percent of the required essential elements was sufficient "mastery" for the purposes of graduation. *See TEA Board of Education Minutes,* June 1990.

The TEA understood the consequences of setting the cut score at 70 percent. When it implemented the TAAS test, the TEA projected that, with a 70–percent cut score, at least 73 percent of African Americans and 67 percent of Hispanics would fail the math portion of the test; at least 55 percent of African Americans and 54 percent of Hispanics would fail the reading section; and at least 62 percent of African Americans and 45 percent of Hispanics would fail the writing section. The predic-

tions for white students were 50 percent, 29 percent, and 36 percent, respectively. However, TEA representatives had reason to believe that those projections were inflated. Experts informed TEA representatives that there is a measurable difference in the motivation between·· students taking a field examination and students taking a test with actual consequences. While the passing numbers were somewhat better than projected, they were nonetheless alarming. On the October 1991 administration of the exam to tenth graders, 67 percent of African Americans and 59 percent of Hispanics failed to meet the passing cut score. For whites, the number was 31 percent.

## OBJECTIVE MEASUREMENT

In spite of projected disparities in passing rates, the TEA determined that objective measures of mastery should be imposed in order to eliminate what it perceived to be inconsistent· and possibly subjective teacher evaluations of students. The TEA offered evidence at trial that such inconsistency exists. The TEA also presented testimony that subjectivity can work to disadvantage minority students by allowing inflated grades to mask gaps in learning.

## REMEDIATION

Failure to master any portion of the exam results in state-mandated remediation in the specific subject area where the student encountered difficulty. There is no state-mandated approach to remediation, however. Consequently, remedial efforts vary from district to district. The evidence at trial reflected varying degrees of success resulting from remedial efforts. The Court finds that, on balance, remedial efforts are largely successful. TEA's expert Dr. Susan Phillips estimates that 44,-515 minority students in 1997 ·were successfully remediated after having failed their first attempt at the TAAS test in 1995. *Report of Dr. Susan Phillips,* Defendants' expert, at 14. The Court finds this evidence credible.

## ACCOUNTABILITY

Administrators, schools, and teachers are held accountable, in varying degrees, for TAAS performance. The accountability system does not ignore the presence of ethnic minorities in the system or the difficulties minorities may have in passing the examination. Passing and failing scores are dis-aggregated, or broken down into subgroups, so that schools and districts are aware of the degree of success or failure of African American, Hispanic, and white students. If one subgroup fails to meet minimum performance standards, a school or district will receive a low accountability rating.

## HISTORY OF TESTING/DISCRIMINATION IN TEXAS

It is beyond dispute that standardized tests have been used in educational contexts to disadvantage minorities. *See Report of Dr. Uri Treisman,* Defendants' expert, at 3. However, the Plaintiffs have presented insufficient evidence to support a finding that the TAAS test, as developed, implemented, and used in Texas, is designed to or does impermissibly disadvantage minorities. While it is true that a number of minority students fail to pass the TAAS test and earn a diploma, there is no evidence that this was the design of the State in initiating the test. On the contrary, there is evidence that one of the goals of the test is to help identify and eradicate educational disparities. The receipt of an education that does not meet some minimal standards is an adverse impact just as surely as failure to receive a diploma.

The Court agrees with Plaintiffs that sufficient evidence, including evidence cited in other state and federal case law, exists to support the Plaintiffs' claim that Texas minority students have been, and to some extent continue to be, the victims of educational inequality. *See Report of Dr. Uri Triesman,* Defendants' Expert, at 7; *see also, e.g., United States v. Texas Educ. Agency,* 467 F.2d 848 (5th Cir.1972), and its progeny; *United States v. Texas,* 330 F.Supp. 235 (E.D.Tex.1971). Witnesses in this case were questioned by counsel and by the Court about the reasons for this inequality. The evidence was disturbing, but inconclusive. Socio-economics, family support, unequal funding, quality of teaching and educational materials, individual effort, and the residual effects of prior discriminatory practices were all implicated. The Court finds that each of these factors, to some degree, is to be blamed.

However, the Plaintiffs presented insufficient evidence to support a finding that minority students do not have a reasonable opportunity to learn the material covered on the TAAS examination, whether because of unequal education in the past or the current residual effects of an unequal system. The Plaintiffs presented evidence to show that, in a more general sense, minorities are not provided equal educational opportunities. In particular, Plaintiffs demonstrated that minorities are underrepresented in advanced placement courses and in gifted-and-talented programs. Minority students are also disproportionately taught by non-certified teachers. However, because of the rigid, state-mandated correlation between the Texas Essentials of Knowledge and Skills and the TAAS test, the Court finds that all Texas students have an equal opportunity to learn the items presented on the TAAS test, which is the issue before the Court. In fact, the evidence showed that the immediate effect of poor performance on the TAAS examination is more concentrated, targeted educational opportunities, in the form of remediation. Moreover, the TEA's evidence that the implementation of the TAAS test, together with school accountability and mandated remedial follow-up, helps address the effects of any prior discrimination and remaining inequities in the system is both credible and persuasive.

## EDUCATIONAL STANDARDS

Current prevailing standards for the proper use of educational testing recommend that high-stakes decisions, such as whether or not to promote or graduate a student, should not be made on the basis

of a single test score. *See Supplemental Report of Dr. Walter Haney,* Plaintiff's expert, at 42 (citing *Standards for Educational and Psychological Testing* (1985)). There was little dispute at trial over whether this standard exists and applies to the TAAS exit-level examination. What was disputed was whether the TAAS test is actually the sole criterion for graduation. As the TEA points out, in addition to passing the TAAS test, Texas students must also pass each required course by 70 percent. *See* TEXAS ADMIN.CODE § 74.26(c). Graduation in Texas, in fact, hinges on three *separate and independent* criteria: the two objective criteria of attendance and success on the TAAS examination, and the arguably objective/subjective criterion of course success. However, as the Plaintiffs note, these factors are not weighed with and against each other; rather, failure to meet any single criterion results in failure to graduate. Thus, the failure to pass the exit-level exam does serve as a bar to graduation, and the exam is properly called a "high-stakes" test.

On the other hand, students are given at least eight opportunities to pass the examination prior to their scheduled graduation date. In this regard, a single TAAS score does *not* serve as the sole criterion for graduation. The TEA presented persuasive evidence that the number of testing opportunities severely limits the possibility of "false negative" results and actually increases the possibility of "false positives," a fact that arguably advantages all students whose scores hover near the borderline between passing and failing.

### DISPARATE IMPACT

The Court finds as an inescapable conclusion that in every administration of the TAAS test since October 1990, Hispanic and African American students have performed significantly worse on all three sections of the exit exam than majority students. However, the Court also finds that it is highly significant that minority students have continued to narrow the passing rate gap at a rapid rate. In addition, minority students have made gains on other measures of academic progress, such as the National Assessment of Educational Progress test. The number of minority students taking college entrance examinations has also increased.

In determining whether a legally significant statistical disparity exists, the Court has had to consider two difficult issues. The first is whether to apply the EEOC's Four–Fifths Rule or some other recognized test for identifying statistical disparity, as the Plaintiffs have argued the Court must do. The second is whether to consider cumulative pass rates or pass rates on a single administration of the examination at the tenth-grade level. The Court's resolution of these issues is discussed more fully in the Conclusions of Law, below.

Plaintiff's statistical expert, Mark Fassold, presented evidence that TAAS exit-level exam failure rates have a racially discriminatory effect under the Four–Fifths Rule [7] and the *Shoben* formula.[8] The TEA contends that Fassold's study is flawed in significant ways and must be rejected. The Court acknowledges that Fassold's data include students who did not sit for the exam in the category of students who "passed" the exam. However, the Court has considered this flaw in its proper context. As the Plaintiffs point out, Fassold's methodology almost certainly artificially *inflates* the minority pass rate by coding those who fail to take the examination as passing. *Report of Mark Fassold,* Plaintiff's expert, at 13 n. 10. Because minorities fail to take the test at a higher rate than majority students, the minority pass rate is inflated at a higher rate than that of the majority pass rate.

---

**7.** The Four–Fifths Rule finds an adverse impact where the passing rate for the minority group is less than 80 percent of the passing rate for the majority group. 29 C.F.R. § 1607.

**8.** The *Shoben* formula seeks to assess the statistical significance of observed numerical disparities by determining differences between independent proportions. *See Frazier v. Consolidated Rail Corp.,* 851 F.2d 1447, 1450 n. 5 (D.C.Cir.1988).

*Id.* Thus, the Court is inclined to agree with Plaintiffs that they have likely *over-estimated* the minority pass rate. In this context, then, the Court finds there is sufficient evidence that, on first-time administration of the exit-level test, a legally significant adverse impact exists. While an examination of cumulative pass scores in more recent years does not evince adverse impact under the Four–Fifths Rule, the disparity there, too, is sufficient to give rise to legitimate concern. *See Cureton v. National Collegiate Athletic Assoc.*, 37 F.Supp.2d, 687, 697 (E.D.Pa.1999) ("no rigid mathematical threshold of disproportionality ... must be met to demonstrate a sufficiently adverse impact"), *rev'd on other grounds*, 198 F.3d 107 (3d Cir.1999). Moreover, as discussed below, there are significant statistical disparities in cumulative pass rates.

In addition to evaluating the statistical impact of the examination, the Court has, at the behest of both parties, considered the "practical consequences" or "practical impact" of the high failure rates of minorities. That consideration involves careful examination of the immediate and long-term effects of the statistically disparate failure rates. The TEA argues that, because of the presence of largely successful remediation, the practical significance benefits minorities. The Plaintiffs note that failure to graduate has serious economic, social, and emotional effects on students.

The Court finds that failure of the exit-level TAAS examination during the first seven administrations results in immediate remedial efforts. At the last administration, of course, failure of the exit-level TAAS examination results in a failure to receive a diploma. However, the Court finds, based on the evidence presented at trial, that the effect of remediation, which is usually eventual success in passing the examination and thus receipt of a high school diploma, is more profound than the steadily decreasing minority failure rate.

**DROP-OUT/RETENTION RATES**

Plaintiffs presented sufficient evidence to support a finding that Texas students, particularly minority students, drop out of school in significant numbers and are retained at their current grade level in numbers that give cause for concern. Moreover, the Plaintiffs presented evidence supporting their contention that drop-out and retention rates for minorities are peculiarly high at the ninth grade, just before the first administration of the exit-level TAAS. *See Supplemental Report of Dr. Walter Haney,* Plaintiff's expert, at 21–29. The evidence presented by Plaintiffs also shows that in the year 1991, as the present TAAS test was being phased in, there was a drop in the ratio of high school graduates to grade nine students three years before, and that this drop was most notable for minority students. *See id.* at 25–26. However, Plaintiffs have failed to make a causal connection between the implementation of the TAAS test and these phenomena, beyond mere conjecture. In other words, Plaintiffs were only able to point to the problem and ask the Court to draw an inference that the problem exists because of the implementation of the TAAS test. That inference is not, in light of the evidence, inevitable. The Defendants hypothesize, just as plausibly, for example, that the ninth grade increase in drop outs is due to the cessation of automatic grade promotion at the beginning of high school in Texas.

**CONCLUSIONS OF LAW[9]**

This lawsuit is properly brought under two causes of action: the implementing regulations of Title VI of the Civil Rights Act of 1964 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**TITLE VI REGULATIONS**

 Title VI of the Civil Rights Act of 1964 is a statute enacted "with the

9. Any conclusion of law more appropriately characterized as a finding of fact may be considered as such.

'intent' to invoke the Fourteenth Amendment's congressional enforcement power." *Lesage v. State of Texas,* 158 F.3d 213, 218 (5th Cir.1998), *cert. filed,* 67 USLW 3469 (Jan. 11, 1999). The TEA, as a state agency that administers and monitors compliance with educational programs required by state and federal laws and as the recipient of federal funds, is governed by Title VI and its regulations. 42 U.S.C. 2000d et seq.; *Castaneda v. Pickard,* 648 F.2d 989, 992 (5th Cir. Unit A 1981). The Plaintiffs have brought this suit, in part, pursuant to 34 C.F.R. § 100.3, a regulation promulgated by the Department of Education to implement Title VI. That regulation prohibits activity in federally funded programs that has the effect of subjecting individuals to discrimination because of their race, color, or national origin. 34 C.F.R. § 100.3; *Powell v. Ridge,* 189 F.3d 387, 396 (3d Cir.1999), *cert. denied,* — U.S. ——, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999); *Elston,* 997 F.2d at 1406. The language of the regulation clearly suggests that a disparate impact analysis is appropriate under this regulation, and courts have applied it in that manner.[10] *See Quarles v. Oxford Mun. Separate Sch. Dist.,* 868 F.2d 750, 754 n. 3 (5th Cir.1989); *City of Chicago v. Lindley,* 66 F.3d 819, 827 (7th Cir.1995); *see also Cureton,* 37 F.Supp.2d at 697 (gathering cases). Similarly, courts have held that plaintiffs bringing lawsuits pursuant to 34 C.F.R. § 100.3 have a private right of action. *Powell,* 189 F.3d at 398; *Cureton,* 37 F.Supp.2d at 689. This Court concurs in that conclusion.

■ A disparate impact theory of racial discrimination permits a court to overturn facially neutral acts and policies that have

"significant adverse effects on protected groups ... without proof that the [actor] adopted those practices with a discriminatory intent." *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 986–87, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). To delineate a standard for evaluating this disparate impact claim, the Court has looked to employment law under Title VII of the Civil Rights Act of 1964, which allows a disparate impact cause of action. *See, e.g., Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *Watson,* 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827; *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

■ Thus, in determining whether a prima facie case of disparate impact has been established, this Court will apply the burden-shifting analysis established in Title VII cases. Under that analysis, the plaintiff must initially demonstrate that the application of a facially neutral practice has caused a disproportionate adverse effect. *Wards Cove,* 490 U.S. at 656–57, 109 S.Ct. 2115. If a plaintiff makes such a showing, a burden of production shifts to the defendant. Under that burden, the defendant must produce evidence that the practice is justified by an educational necessity. *Id.* The plaintiff may then ultimately prevail by demonstrating that an equally effective alternative practice could result in less racial disproportionality while still serving the articulated need. *Watson,* 487 U.S. at 998, 108 S.Ct. 2777.

## I. Disparate Impact

■ In determining whether an adverse impact exists in this case, the Court has

---

**10.** As noted elsewhere, the TEA has suggested that this regulation has been limited to its constitutional dimensions (i.e., to a requirement that a plaintiff show discriminatory intent) by the United States Supreme Court, in *United States v. Fordice,* 505 U.S. 717, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992). The Court acknowledges the dicta to which the TEA refers. *See Fordice,* 505 U.S. at 732, 112 S.Ct. 2727. However, the Court notes that other courts have not held that the disparate impact analysis under 34 C.F.R. § 100.3 has

been abrogated. *See Cureton,* 37 F.Supp.2d at 697 (collecting cases); *Graham v. Tennessee Secondary Sch. Athletic Assoc.,* No. 1:95–cv–044, 1995 WL 115890, at *12 (E.D.Tenn. Feb.20, 1995) (joining other courts in maintaining disparate impact claim after *Fordice* ). It is this Court's duty to *apply* the law, as near as it is able, and only to *predict* what the law will be when absolutely necessary. *See Charles J. Cooper, Stare Decisis: Precedent & Principal in Constitutional Adjudication,* 73 Cornell L.Rev. 401 at n. 6 (1988).

considered and applied the Equal Employment Opportunity Commission's Four–Fifths Rule. *See* 29 C.F.R. § 1607.4(d). The Court disagrees with the TEA's argument that this test is not suited for identifying the presence of adverse impact in this context. *See Cureton*, 37 F.Supp.2d at 700 (applying Four–Fifths Rule). In addition, the Court notes that the TEA did not offer in its briefing or at trial a satisfactory substitute for determining a statistical disparity, choosing instead to rely on its arguments that a disparate impact theory should not be applied in a Title VI case or, alternatively, that the Court should consider only the practical effect of remediation.

In addition to the Four–Fifths Rule, the Court has considered the statistical significance of the observed differences in pass rates. The methodology for such consideration, referred to by these parties as the *Shoben* formula, is to find a "z-score," or a number representing the differences between independent proportions—here the pass rates of minority students and the pass rates of majority students. *See Report of Mark Fassold*, Plaintiff's expert, at 4–6; *Preliminary Report of Dr. Walter Haney*, Plaintiff's expert, at 13.

The evidence regarding whether Plaintiffs have established the existence of a significant adverse impact on minority students is mixed. Plaintiffs' statistical analysis, while somewhat flawed, demonstrates a significant impact on first-time administration of the exam. This impact, which clearly satisfies the Four–Fifths Rule, is conceded by at least one TEA expert. *See Report of Dr. Susan Phillips*, Defendants' expert, at 13. However, cumulative pass rates do not demonstrate so severe an impact and, at least for the classes of 1996, 1997, and 1998, are not statistically significant under the EEOC's Four–Fifths Rule. *See id.* at 14.

In considering how to handle the dilemma of choosing between cumulative and single-test administration, the Court has taken into account the immediate impact of initial and subsequent in-school failure of the exam—largely successful educational remediation. In addition, the Court has considered the evidence that minority scores have shown dramatic improvement. These facts would seem to support the TEA's position that cumulative pass rates are the relevant consideration here.

The Plaintiffs argue that successful remediation and pass-rate improvement should not be considered in determining whether an adverse impact exists. To support their argument, the Plaintiffs point to case law holding that a "bottom line" defense is insufficient to combat a showing of adverse impact. *See Connecticut v. Teal*, 457 U.S. 440, 455, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). The Court is not convinced that this argument is applicable to the case before it.

In *Connecticut v. Teal*, the United States Supreme Court held that an employer charged with a Title VII violation could not justify discrimination against one individual by pointing to its favorable treatment of other members of the same racial group. *Id.* at 454, 102 S.Ct. 2525. According to the Court, Title VII requires an employer to provide "an equal opportunity for each applicant regardless of race." *Id.* In that case, however, the employer was trying to compensate for a discriminatory selection test by arguing that subsequent affirmative action practices allowed the employer to reach a non-discriminatory "bottom-line." *Id.* at 452–53, 102 S.Ct. 2525. As another court has stated, *Teal* stands for the proposition that "the disparate exclusion of minority candidates at the first stage of the selection process was not ameliorated by the favorable end result because excluded candidates were deprived individually of the opportunity for promotion." *Lindley*, 66 F.3d at 829.

The Court will assume that *Teal's* analysis applies in Title VI cases. *Id.* However, the Court is not sure that *Teal* is relevant here. Failure to pass the first administration of the TAAS test does not deny an individual a competitive opportunity. It is only after at least *eight* tries that there is a real negative impact. This is not a case

where there are several distinct steps through a selection system. *See Newark Branch, NAACP v. Town of Harrison, N.J.*, 940 F.2d 792, 801 (3d Cir.1991). Nor is it the TEA's argument that the test is legal because, while some individuals fail and do not receive diplomas, others *do* and so the disparate effect is ameliorated. Rather, the TEA is arguing that each individual student is given at least eight tries to pass the exam and that many students who fail on the first attempt eventually succeed. The Court believes that these facts distinguish this case from *Teal*, and the Court will reject the *Teal* analysis. Thus, the Court has considered, and found relevant, the distinction between pass rates after a single administration and pass rates after eight attempts.

Having said all that, however, the Court finds that, whether one looks at cumulative or single-administration results, the disparity between minority and majority pass rates on the TAAS test must give pause to anyone looking at the numbers. The variances are not only large and disconcerting, they also apparently cut across such factors as socioeconomics. Further, the data presented by the Plaintiffs regarding the statistical significance of the disparities buttress the view that legally meaningful differences do exist between the pass rates of minority and majority students. Disparate impact is suspected if the statistical significance test yields a result, or z-score, of more than two or three standard deviations. *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). In all cases here, on single and cumulative administrations, there are significant statistical differences under this standard. Given the sobering differences in pass rates and their demonstrated statistical significance, the Court finds that the Plaintiffs have made a prima facie showing of significant adverse impact. *See Supplemental Report of Dr. Walter Haney*, Plaintiff's Expert, at 4–5 (discussing practical adverse impact); *Cureton*, 37 F.Supp.2d at 697 ("no rigid mathematical threshold of disproportionality ... must be met to demonstrate a sufficiently adverse impact").

## II. Educational Necessity

Having found that the Plaintiffs have established a prima facie showing of significant adverse impact, the Court must consider whether the TEA has met its burden of production on the question of whether the TAAS test is an educational "necessity." The word "necessity," as an initial matter, is somewhat misleading; the law does not place so stringent a burden on the defendant as that word's common usage might suggest. Instead, an educational necessity exists where the challenged practice serves the *legitimate* educational goals of the institution. *Wards Cove*, 490 U.S. at 659, 109 S.Ct. 2115. In other words, the TEA must merely produce evidence that there is a manifest relationship between the TAAS test and a legitimate educational goal. *Teal*, 457 U.S. at 446, 102 S.Ct. 2525. The Court finds that the TEA has met its burden.

The articulated goals of the implementation of the TAAS requirement are to hold schools, students, and teachers accountable for education and to ensure that all Texas students receive the same, adequate learning opportunities. These goals are certainly within the legitimate exercise of the State's power over public education. To determine whether the TAAS test bears a manifest relationship to these legitimate goals, the Court has considered carefully each of the test's alleged deficiencies—the overall effectiveness of the test, the cut score of the test, the use of the test as a requirement for graduation, the Plaintiffs' allegation that the test has resulted in inferior educational opportunities for minorities, and the alleged relationship between the test and student drop out scores.

### A. Effectiveness

The Court finds that the TAAS test effectively measures students' mastery of the skills and knowledge the State of Tex-

as has deemed graduating high school seniors must possess. The Plaintiffs provided evidence that, in many cases, success or failure in relevant subject-matter classes does not predict success or failure in that same area on the TAAS test. *See Supplemental Report of Dr. Walter Haney,* Plaintiff's expert, at 29–32. In other words, a student may perform reasonably well in a ninth-grade English class, for example, and still fail the English portion of the exit-level TAAS exam. The evidence suggests that the disparities are sharper for ethnic minorities. *Id.* at 33. However, the TEA has argued that a student's classroom grade cannot be equated to TAAS performance, as grades can measure a variety of factors, ranging from effort and improvement to objective mastery. The TAAS test is a solely objective measurement of mastery. The Court finds that, based on the evidence presented at trial, the test accomplishes what it sets out to accomplish, which is to provide an objective assessment of whether students have mastered a discrete set of skills and knowledge.

**B. Cut Score**

The Court has paid close attention to testimony in this case regarding the setting of the 70–percent passing standard for the TAAS test. In addition, the Court has carefully considered the scope of its own authority to address that issue. Ultimately, the Court concludes that the passing standard does bear a manifest relation to a legitimate goal.

Whether the use of a given cut score, or any cut score, is proper depends on whether the use of the score is justified. In *Cureton,* a case relied upon heavily by the Plaintiffs in this case, the court found that the use of an SAT cut score *as a selection practice for* the NCAA must be justified by some independent basis for choosing the cut score. *Cureton,* 37 F.Supp.2d at 708. In addition, the court noted that the NCAA had not validated the use of the SAT as a predictor for graduation rates. *Id.*

Here, the test use being challenged is the assessment of legislatively established minimum skills as a requisite for graduation. This is a conceptually different exercise from that of predicting graduation rates or success in employment or college. In addition, the Court finds that it is an exercise well within the State's power and authority. The State of Texas has determined that, to graduate, a senior must have mastered 70 percent of the tested minimal essentials.

In *Tyler v. Vickery,* 517 F.2d 1089 (5th Cir.1975), the United States Court of Appeals for the Fifth Circuit noted two criteria for determining whether a standardized test is rationally supportable. *Tyler,* 517 F.2d at 1101. The relevant criterion here is whether the cut score is related to the quality the test purports to measure. *Id.* The court noted that a 70–percent cut score for bar passage "has no significance standing alone" but that it "represents the examiners' considered judgments as to minimal competence required to practice law." *Id.* The Court finds that the 70–percent cut score for the TAAS test reflects similar judgments. *See Report of the State Board of Education Committee of the Whole, Work Session Minutes,* July 12, 1990. The Court does not mean to suggest that a state could arrive at *any* cut score without running afoul of the law. However, Texas relied on field test data and input from educators to determine where to set its cut score. It set initial cut scores 10 percentage points lower, and phased in the 70–percent score. *See State Board of Education Minutes,* July 14, 1990. While field test results suggested that a large number of students would not pass at the 70–percent cut score, officials had reason to believe that those numbers were inflated. *See Work Session Minutes,* July 12, 1990. Officials contemplated the possible consequences and determined that the risk should be taken. The Court cannot say, based on the record, that the State's chosen cut score was arbitrary or unjustified. Moreover, the Court finds

that the score bears a manifest relationship to the State's legitimate goals.

## C. Use as a Graduation Requirement

The Court finds that the TEA has shown that the high-stakes use of the TAAS test as a graduation requirement guarantees that students will be motivated to learn the curriculum tested. While there was testimony that the test would be useful even if it were not offered as a requisite to graduation, the Court finds that there was no, or insufficient, evidence to refute the TEA's assertion that the use as a graduation requirement boosted student motivation and encouraged learning. In addition, the evidence was unrefuted that the State had an interest in setting standards as a basis for the awarding of diplomas. The use of a standardized test to determine whether those standards are met and as a basis for the awarding of a diploma has a manifest relationship to that goal.

## D. Inferior Educational Opportunities

The Plaintiffs introduced evidence that, in attempting to ensure that minority students passed the TAAS test, the TEA was limiting their education to the barest elements. The Court finds that the question of whether the education of minority students is being limited by TAAS-directed instruction is not a proper subject for its review.[11] The State of Texas has determined that a set of knowledge and skills must be taught and learned in State schools. The State mandates no more than these "essential" items. Test-driven instruction undeniably helps to accomplish this goal. It is not within the Court's power to alter or broaden the curricular decisions made by the State.

## E. Drop–Out and Retention Rates

As discussed above, the Plaintiffs have presented credible evidence that the drop-out and retention rates among minority students in Texas give cause for concern. However, there is no credible evidence linking State drop-out and retention rates to the administration of the exit-level TAAS test. Expert Walter Haney's hypothesis that schools are retaining students in the ninth grade in order to inflate tenth-grade TAAS results was not supported with legally sufficient evidence demonstrating the link between retention and TAAS.

## III. Equally Effective Alternatives

In considering whether the Plaintiffs have shown that there are equally effective alternatives to the current use of the TAAS test, the Court must begin with the State's articulated, legitimate goals in instituting the examination. Those goals are to hold students, teachers, and schools accountable for learning and for teaching, to ensure that all students have the opportunity to learn minimal skills and knowledge, and to make the Texas high school diploma uniformly meaningful. Further, as discussed more fully above, the State has set a standard for mastery of 70 percent of the items tested, and the Court has held that this standard is legitimate.

Plaintiffs did offer evidence that different approaches would aid the State in measuring the acquisition of essential skills. Among these approaches was a sliding-scale system that would allow educators to compensate a student's low test performance with high academic grades or to compensate lower grades with outstanding test scores. However, Plaintiffs failed to present evidence that this, or other, alternatives could sufficiently motivate students to perform to their highest ability. In addition, and perhaps more importantly, the present use of the TAAS test motivates schools and teachers to provide an adequate and fair education, at least of the minimum skills required by the State, to all students. *See Debra P. II,* 730 F.2d at

---

11. Of course, upon a showing of intentional discrimination, such a claim would implicate the Equal Protection Clause of the Fourteenth Amendment. However, the Court has already held that Plaintiffs have offered no proof of intent in this case.

1416. The Plaintiffs produced no alternative that adequately addressed the goal of systemic accountability.

## DUE PROCESS

■ In order for a court to find a due process violation, it must first find that a plaintiff has a protected interest—either property or liberty—in what the State seeks to limit or deny. *See Michael H. v. Gerald D.*, 491 U.S. 110, 121, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (substantive due process, liberty interest); *Ewing*, 474 U.S. at 222, 106 S.Ct. 507 (substantive due process, property interest); *Ewing*, 474 U.S. at 229, 106 S.Ct. 507 (procedural due process, property interest). The Court has previously found, and reiterates here, that the State of Texas has created a protected interest in the receipt of a high school diploma. *See* Tex.Educ.Code § 25.085(b); *id.* at § 4.002; *id.* at § 28.025(a)(1); *Debra P.*, 644 F.2d at 403–404.

The Due Process Clause has two aspects—procedural and substantive. *Ewing*, 474 U.S. at 229, 106 S.Ct. 507. On the procedural side, the law demands that a state provide, at a minimum, notice and an opportunity to be heard before it deprives citizens of certain state-created protected interests. *Frazier v. Garrison I.S.D.*, 980 F.2d 1514, 1529 (5th Cir.1993). On the substantive side, the law holds that some rights are so profoundly inherent in the American system of justice that they cannot be limited or deprived arbitrarily, even if the procedures afforded an individual are fair. *Ewing*, 474 U.S. at 229, 106 S.Ct. 507; *Robertson v. Plano City*, 70 F.3d 21, 24 (5th Cir.1995). The use of a standardized test as a graduation requirement can implicate both procedural due process concerns and substantive due process concerns. *Debra P.*, 644 F.2d at 404.

The United States Court of Appeals for the Fifth Circuit has held that a state cannot impose a standardized test as a graduation requirement without giving its students the procedural protection of adequate notice that such will be the use of the test. *Id.* at 404. In addition, the Fifth Circuit has suggested a *substantive* component to a student's rights where a state attempts to condition a diploma on standardized test scores: a state may not impose an examination where such imposition is arbitrary and capricious or frustrates a legitimate state interest or is fundamentally unfair, in that it encroaches upon concepts of justice lying at the basis of our civil and political institutions. *Id.* The United States Supreme Court has suggested that a state's educational determinations may be invalid under a substantive due process analysis where they reflect a "substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225, 106 S.Ct. 507. The Court has evaluated the use of the TAAS examination under each of these formulations and finds that it does not violate the due process rights of Texas students, minority or majority.

A test that covers matters not taught in the schools is fundamentally unfair. *Debra P.*, 644 F.2d at 404. The Court finds, however, that the TAAS exit-level test meets currently accepted standards for curricular validity. In other words, the test measures what it purports to measure, and it does so with a sufficient degree of reliability. In addition, all students in Texas have had a reasonable opportunity to learn the subject matters covered by the exam. The State's efforts at remediation and the fact that students are given eight opportunities to pass the examination before leaving school support this conclusion. *Debra P. II*, 730 F.2d at 1411.

The Court also finds that the Plaintiffs have not demonstrated that the TAAS test is a substantial departure from accepted academic norms or is based on a failure to exercise professional judgment. Certainly, there was conflicting evidence at trial regarding whether the test, as used, is appropriate. However, there was no testimony demonstrating that Texas has rejected current academic standards

in designing its educational system. Educators and test-designers testified that the design and the use of the test was within accepted norms.

The Court, in reaching this conclusion, has considered carefully the testimony of Plaintiffs' expert, Dr. Martin Shapiro, demonstrating that the item-selection system chosen by TEA often results in the favoring of items on which minorities will perform poorly, while disfavoring items where discrepancies are less wide. The Court cannot quarrel with this evidence. However, the Court finds that the Plaintiffs have not been able to demonstrate that the test, as validated and equated, does not best serve the State's goals of identifying and remediating educational problems. Because one of the goals of the TAAS test is to identify and remedy problems in the State's educational system, no matter their source, then it would be reasonable for the State to validate and equate test items on some basis other than their disparate impact on certain groups. In addition, the State need not equate its test on the basis of standards it rejects, such as subjective teacher evaluations.

In short, the Court finds, on the basis of the evidence presented at trial, that the disparities in test scores do not result from flaws in the test or in the way it is administered. Instead, as the Plaintiffs themselves have argued, some minority students have, for a myriad of reasons, failed to keep up (or catch up) with their majority counterparts. It may be, as the TEA argues, that the TAAS test is one weapon in the fight to remedy this problem. At any rate, the State is within its power to choose this remedy.

As the Court has stated in prior orders, it would be fundamentally unfair to punish minority students for receiving an unequal, state-funded education.[12] In other words, it would violate due process if the TAAS test were used as a vehicle for holding students accountable for an educational system that failed them. The Court concludes, however, that the TAAS test is not used in such a manner.

The Court has considered this question carefully. Texas's difficulties in providing an equal education to all its students are well-documented. It is only in the recent past that efforts have been made to provide equal funding to Texas public schools. Several schools in the state remain under desegregation orders. These facts cannot be ignored.

The Court finds, however, after listening to the evidence at trial, that the TEA would agree with the proposition that unequal education is a matter of great concern and must be eradicated. The Court has determined that the use and implementation of the TAAS test does identify educational inequalities and attempts to address them. *See Debra P. II*, 730 F.2d at 1415 (remedial efforts help dispel link between past discrimination and poor performance on standardized test). While lack of effort and creativity at the local level sometimes frustrate those attempts, local policy is not an issue before the Court. The results of the TAAS test are used, in many cases quite effectively, to motivate not only students but schools and teachers to raise and meet educational standards.

### CONCLUSION

ACCORDINGLY, the Court finds that the TAAS exit-level examination does not violate regulations enacted pursuant to Ti-

**12.** In *Debra P. II*, the United States Court of Appeals for the Fifth Circuit articulated this concern in equal protection terms, reiterating the proposition that an educational system still suffering from the effects of prior discrimination cannot classify students based on race unless that classification can be shown either not be a result of prior discrimination or that it will remedy such discrimination.

*See Debra P. II*, 730 F.2d at 1411. This Court has dismissed the Plaintiff's equal protection claim. Nonetheless, the Court has stated, and emphasizes again here, that it would be a due process violation to impose standards on minority students whose failure to meet those standards is directly attributable to state action.

tle VI of the Civil Rights Act of 1964. While the TAAS test does adversely affect minority students in significant numbers, the TEA has demonstrated an educational necessity for the test, and the Plaintiffs have failed to identify equally effective alternatives. In addition, the Court concludes that the TAAS test violates neither the procedural nor the substantive due process rights of the Plaintiffs. The TEA has provided adequate notice of the consequences of the exam and has ensured that the exam is strongly correlated to material actually taught in the classroom. In addition, the test is valid and in keeping with current educational norms. Finally, the test does not perpetuate prior educational discrimination or unfairly hold Texas minority students accountable for the failures of the State's educational system. Instead, the test seeks to identify inequities and to address them. It is not for this Court to determine whether Texas has chosen the best of all possible means for achieving these goals. The system is not perfect, but the Court cannot say that it is unconstitutional. Judgment is GRANTED in favor of the Defendants, and this case is DISMISSED.